# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**S. ANTHONY LONG**
**S. ADAM LONG**
Long & Mathies Law Firm, P.C.
Boonville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana



FILED
Apr 24 2013, 9:35 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| RYAN SHELBY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 87A01-1207-CR-313 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WARRICK CIRCUIT COURT
The Honorable David O. Kelley, Judge
Cause No. 87C01-1104-MR-186

**April 24, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Ryan Shelby ("Shelby") was convicted in Warrick Circuit Court of murder, Class

D felony obstruction of justice, and two counts of Class A misdemeanor false informing.

Shelby appeals and presents numerous issues, which we reorder, renumber, and restate

as:

I.      Whether the trial court abused its discretion when it denied Shelby's
        request to view the murder scene and independently collect evidence
        without supervision;

II.     Whether the trial court abused its discretion in denying Shelby's motion to
        certify for interlocutory appeal its order that Shelby's viewing the crime
        scene was to be supervised;

III.    Whether the cumulative effect of the following alleged errors require
        reversal of Shelby's convictions:  (A) Brady violations by the State; (B) the
        failure of the police to investigate other suspects; (C) the presentation of
        "corrupt" testimony in the form of inconsistent testimony by witnesses; (D)
        the trial court's rejection of several of Shelby's tendered jury instructions;
        and (E) prosecutorial misconduct;

IV.     Whether the trial court erred when it admitted into evidence Shelby's
        confession to the police;

V.      Whether the trial court abused its discretion in excluding certain testimony
        from Shelby's expert witness; and

VI.     Whether the trial court abused its discretion by failing to consider "residual
        doubt" as a mitigating factor in sentencing.

We affirm.

**Facts and Procedural History**

What follows is a statement of the facts which are favorable to the jury's verdict.[1]

Jessica Oesterle ("Jessica") had a daughter, Alexis ("Lexi"), who was born in January

---

[1]  The Statement of Facts in Shelby's brief does not comply with applicable Indiana Appellate Rules, which provide that the statement of facts in an appellant's brief "*shall* be stated in accordance with the standard of review appropriate to the judgment or order being appealed," and "*shall* be in narrative form and shall not be a witness by witness summary of the testimony."  Ind. Appellate Rule 46(A)(6)(b), (c).

1994. Jessica and her girlfriend lived in Florida with Lexi until 2007, when Jessica and Lexi moved to Owensboro, Kentucky. Shortly thereafter, Jessica met Shelby, and the two began a romantic relationship. After approximately two months of dating Shelby, Jessica and Lexi moved in with Shelby, and the couple later married. Lexi and Shelby developed a close relationship, and Lexi referred to Shelby as "dad." Tr. p. 1359.

By February 2008, Jessica was pregnant. Shelby, though, was reluctant to tell his parents about the pregnancy, and Jessica and Shelby's parents had an inimical relationship. Shelby tried to avoid conflict with his parents over his relationship with Jessica and ultimately moved to Rockport, Indiana with Jessica and Lexi in the spring of 2008. After the move, Shelby's relationship with Jessica began to deteriorate. Lexi too began to have behavioral problems. Shelby's daughter with Jessica, A.S., was born in December 2008, and Lexi was very close with her baby sister.

By May of 2009, Lexi's behavior had become a serious problem, and Jessica had to call the police several times to help her with Lexi. Jessica told the police that Lexi had tried to fight her, but that she refused to fight her daughter back. Jessica eventually admitted Lexi to the Deaconess Cross Pointe facility for mental health treatment in May 2009. There, Lexi was diagnosed with a non-specified mood disorder and her conflict with her parents was noted. Lexi was prescribed a mood-stabilizing drug and discharged within a week. In late June 2009, Lexi attempted suicide after her boyfriend ended their relationship. As a result, she was admitted to River Valley Behavioral Health Hospital

---

Shelby's statement of facts is a witness-by-witness summary of the testimony, is not in narrative form, and is not stated in accordance with the standard of review.

for a week, where she was diagnosed with adjustment disorder with a disturbance of mood and anxiety; her parental conflict issues were again noted.

In August 2009, Shelby left home with A.S., who was then six months old, to visit his parents in Kentucky, and he did not return home. Jessica repeatedly, but unsuccessfully, attempted to telephone Shelby. Obviously upset by this turn of events, Jessica filed for a dissolution of her marriage with Shelby. To help pay for the services of an attorney, Jessica sold most of Shelby's large knife collection, but kept one larger, sheathed knife.

Sometime in September 2009, Lexi received a text message from one of her friends informing her that Shelby was at the local high school that Lexi attended. Shelby was visiting his sister, who was a teacher there, and had A.S along with him. Upset that Shelby had kept her baby sister away for so long, Lexi went to the school and confronted Shelby and threatened Shelby's sister. Lexi's threat to Shelby's sister resulted in Lexi's expulsion from the school.

Also in September, Shelby and Jessica attended a custody hearing in their dissolution proceedings and entered into a custody agreement. Shortly thereafter, Shelby returned to live with Jessica. When he returned home, Shelby inquired as to where his knife collection had gone. Jessica did not tell Shelby that she had sold the knives, but she did return the larger, sheathed knife to him. Despite his return home, Shelby's relationship with Jessica was still strained, and Jessica believed that Shelby had not told his parents that he had returned to live with her. Shelby and Lexi also argued frequently

4

about A.S., as Lexi was upset that Shelby had taken A.S. away from Jessica and Lexi for so long.

On October 31, 2009, Lexi spent the night with friends while Shelby and Jessica went out for the evening, and Shelby's parents watched A.S. Shelby and Jessica seemed to be patching up their relationship and spoke of buying a house and having another baby. The following morning, Shelby drove to Owensboro to pick up A.S. from his parents' house. Jessica wanted Shelby to return quickly so that she could spend time with A.S. Lexi called Shelby while he was going to get A.S. and asked him for money. She later called back and told Shelby that she hated him. Lexi returned home before Shelby.

When Shelby did return, he did not have A.S. with him. Jessica was upset that her daughter was not with Shelby and ordered him to return to Owensboro and get her. Shelby drove away, but instead of going to get A.S., he drove around, thinking that if he waited, Jessica would be too tired to press the issue further that night. Shelby called Jessica on his mobile phone and claimed that he needed to fuel his car. When Shelby did not return home, Jessica called him and asked where he was. Shelby told her that the credit card reader on the pump at the BP station was broken and that he had to go to another gas station. Jessica was suspicious that Shelby was lying to her, so she called the BP station and asked if the card reader was broken; she was told that it was not. Shelby then called Jessica again and told her that he was at another gas station and that his car had stopped running. Shelby falsely told Jessica that he had A.S. with him.

Jessica then got into a truck that Shelby had borrowed from his father and went to pick Shelby up at the gas station. When she did not find Shelby at the gas station, she

returned home. Shelby had returned home and parked his car at a storage facility located at the end of the street so that it would not be seen at home. Shelby hoped to get the key to his storage facility, get some clothes, and spend the night at his sister's house. Shelby walked through some woods to the backyard.

In the meantime, Lexi's friend Jacob Gunter ("Gunter") came over to visit Lexi, and the two talked in the driveway. Lexi told Gunter that her mother was angry with her father, Shelby, for having taken A.S. and that her mother had gone to find Shelby. Gunter and Lexi saw the shadowy figure of Shelby go from the woods to the back of the house. Shelby then called Lexi repeatedly on her mobile phone, so she walked to the back of the house, telling Gunter that she would return.

In the back yard, Lexi confronted Shelby over where he had taken A.S. Lexi then walked back to the driveway to talk to Gunter. Lexi was upset and near tears. Gunter also noticed that Lexi had a steak knife in her hand. Gunter took the knife away from Lexi, and placed it in his vehicle, telling Lexi not to do anything stupid. Gunter also saw a white man peek his head around the corner of the home, and when Gunter asked Lexi who the man was, she replied that it was her dad. Gunter told Lexi to calm down, but Lexi stated that she was so angry that she could stab her father. Gunter left at approximately 11:00 p.m., and Lexi returned to the back yard with Shelby.

Lexi again confronted Shelby with questions of where A.S. was and why he had not brought her back. Shelby told Lexi, "that's enough[.]" Ex. Vol. State's Ex. 5 at 24:43. Lexi then came at Shelby with a knife in her hand as if to stab Shelby in the stomach. Shelby, a U.S. Navy veteran, disarmed Lexi. But when Lexi approached him

6

again, unarmed, Shelby slashed at the girl's throat with the knife. Lexi fell to the ground, grabbing her throat. Shelby then repeatedly stabbed Lexi in the throat and neck. Shelby dragged Lexi by her ankles to the back of the backyard shed. Shelby left Lexi there, dead, and ran to his car. He drove away with his lights off, drove outside of town, and threw the knife away in a wooded area near a back road.

At approximately 11:09 p.m., Jessica returned home and found that no one was there. She assumed Lexi had gone out with her friends, which she had previously mentioned. Gunter also texted Lexi at 11:09 p.m., and asked her, "Is everything ok?" Tr. p. 1136. But his text went unanswered.

Jessica then left home again to look for Shelby and telephoned him from the BP gas station. When she got ahold of Shelby, he told her that he would be home in a few minutes. Jessica returned home at 11:27 p.m., and Shelby returned two minutes later, without A.S. After discussing the situation, the couple went to bed.

The next day, Jessica was not concerned about Lexi's whereabouts until she failed to come home to eat. She then noticed that Lexi's mobile phone charger was still in the house, which was unusual. When Shelby returned home, Jessica asked to use his phone to call Lexi's friends. Shelby, however, wanted to telephone the police. Jessica drove to one of Lexi's friend's house while Shelby reported Lexi missing.

Spencer County Sheriff's Deputy Jason Dunsworth ("Deputy Dunsworth") responded to the call and came to Jessica and Shelby's home. Deputy Dunsworth asked to look around the home, and both Jessica and Shelby consented. Deputy Dunsworth took photographs of the home, including one showing Shelby's boots on the floor by the

7

coat rack. Deputy Dunsworth asked for a photograph of Lexi, and Jessica gave him a memory card from her camera, which contained photographs of Lexi. Deputy Dunsworth then returned to the station to retrieve the photographs from the memory card.

Deputy Dunsworth returned to Jessica and Shelby's home approximately twenty minutes later and asked for permission to open the garage door and look inside the garage. The couple gave him permission, and Shelby opened the garage door. Deputy Dunsworth also informed the couple that he would check the area immediately surrounding the yard. When he looked behind the shed near the tree-line of the woods, he saw Lexi's body and immediately called for backup.

Rockport Police Chief Dale Meridith ("Chief Meridith") responded to the scene. He saw the body and went inside the home to inform Jessica and Shelby that they believed they had found Lexi's body. When told that Lexi was dead, Jessica immediately went into hysterics and almost fainted. Shelby's reaction, however, went unnoted by the officers.

The Indiana State Police then took over the investigation of Lexi's death. Both Jessica and Shelby were taken to the police station for statements, and the police obtained a warrant to search the home. Detective Robert Gardner ("Detective Gardner") observed two aspects of Shelby's written statement that caught his attention. First, Shelby had written that he and Jessica had gone to the home of Lexi's friend and asked her "to call us if she when she did see her," striking out what he had originally written. Ex. Vol., State's Ex. 19; Tr. pp. 761-62. Detective Gardner wondered why Shelby changed such a relatively small detail. Detective Gardner also noted that Shelby's statement indicated

8

that he left the BP gas station because the credit card reader was broken, but later paid cash for fuel at the other gas station.

The police also interviewed Lexi's friend Gunter, who told them what he had seen the night of Lexi's death. He also gave them the steak knife he had taken from Lexi. Investigation of the crime scene revealed that Lexi's body had been dragged on her back with her clothes pulled up around her abdomen as if dragged by her feet. Lexi had bled profusely, and the police found a large pool of blood about three feet from the backyard fence. Blood was also spattered on the fence. There was a trail of blood from the pool of blood to the area behind the shed where Lexi's body was found. Also, Lexi's sandals appeared to have been thrown in to the nearby woods.

The next morning, Detective Gardner went to the hotel where the police had provided lodging for Shelby and Jessica for the night. Shelby agreed to speak with the police and was read his Miranda rights. Shelby admitted that he had lied about the gas station and that he simply had not wanted to return home because of his argument with Jessica. When the police told him that they knew he had been at home at the time of Lexi's death, he denied any involvement. He also told the police that Jessica would never hurt Lexi and that she was not involved with Lexi's death. Shelby was then taken back to the hotel, and he agreed to speak with the police again the next day.

An autopsy of Lexi's body was conducted later that same day and revealed two causes of death: five or six blunt-force injuries to her forehead, which resulted in two skull fractures, and several severe stab wounds to her neck. Two deep stab wounds on the right side of her neck had severed the carotid artery, and there were also several other

9

smaller wounds to her neck.  Lexi also had a stab wound on the back of her neck that went through the collar of her heavy jacket and entered her cervical spine.  Lexi died quickly from the resulting loss of blood.  Lexi had no signs of defensive wounds.

While executing the search warrant, the police discovered an open empty knife sheath under the seat of the truck Shelby usually drove.  Shelby's boots, which had initially been seen near the coat rack, were found in the master bedroom closet. Inspection of these boots revealed blood and a small piece of soft tissue near the buckle of the right boot.  DNA testing of this tissue indicated that it had come from Lexi.

As agreed, the police spoke with Shelby again the next morning, November 4, 2009.  Shelby was again informed of his Miranda rights both orally and in writing. Although Shelby indicated at one point that he felt tired, he stated that he had gotten approximately six hours of sleep the night before, which was typical for him.  The police then questioned Shelby for roughly four hours.  The police gave Shelby two breaks to go walk and smoke.  The police confronted Shelby with the information that they had found blood and tissue on his boots and also found the knife sheath.  They also said that they could track his location on the night in question by using his mobile phone.  After initially maintaining his denial, Shelby eventually admitted that he had stabbed Lexi after she came at him with a knife.  Shelby told the police that he had stabbed Lexi multiple times in the neck near the fence.  These were details that the police had never told Shelby. Shelby also told the police where he had thrown the knife, but the knife was never recovered despite an extensive search.

On November 10, 2009, the State charged Shelby with murder. The information was amended on January 29, 2010 to add charges of Class D felony obstruction of justice and two counts of Class A misdemeanor false informing. Shelby filed a motion seeking to view the crime scene and impound evidence on November 20, 2009. The trial court held a hearing on this matter on December 18, 2009,[2] and on February 2, 2010, the trial court granted Shelby's motion in part and denied it in part, concluding that Shelby could view the crime scene but only if accompanied by a police officer or a representative from the prosecutor's office. Shelby petitioned the trial court to certify this order for interlocutory appeal, but the trial court denied Shelby's petition. And in March 2010, the parties submitted reports to the trial court regarding Shelby's viewing of the crime scene.

On February 24, 2011, Shelby filed a motion to suppress the statement he had given to the police in which he confessed. Shelby then sought and was granted a change of venue to Warrick Circuit Court. After the transfer of venue, Shelby filed a renewed motion to view the crime scene on May 24, 2011, which the new trial court granted on June 20, 2011, providing that "counsel for the defendant and the defense team . . . hereby are granted leave to view the real property . . . with the consent of the property owner/current occupant at a mutually convenient time."[3] Appellee's App. p. 380. The trial court later denied Shelby's motion to suppress his statement.

A jury trial was held between April 30, 2012 and May 25, 2012. At the conclusion of the trial, the jury found Shelby guilty as charged. The trial court conducted

---

[2] A transcript of this hearing was not included with the materials presented to us on appeal.

[3] By this time, Jessica and A.S. no longer lived at the home in question.

a sentencing hearing on June 20, 2012, and sentenced Shelby to the advisory term of fifty-five years for the murder conviction, the advisory term of one and one-half years on the Class D felony obstruction of justice conviction, and one year each on both Class A misdemeanor false informing convictions. The trial court also ordered the sentences to be served concurrently. Shelby now appeals.

### I. Defendant's View and Inspection of Crime Scene

Shelby first claims that the trial court erred when it denied his request to view the murder scene and independently collect evidence without supervision. Shelby claims that his defense team had a right to inspect the crime scene without the presence of the police or the prosecuting attorney and that he had a right to strategize and prepare without the State or one of its agents being able to observe.

The trial court's February 2, 2010 order on Shelby's motion to view the crime scene provided as follows:

> With respect to the Defendant's Motion for Immediate View of Crime Scene and for Impoundment of Potential Evidence and the State's Response to the same, the Court grants Defendant's Motion in part and Denies Defendant's Motion in part. The Defense shall have a right to view the crime scene and take photographs inside and outside the residence at a mutually agreeable time arranged through the State of Indiana. Said viewing shall be done taking into account the convenience and privacy concerns of the current occupants of the property. The Defense may have counsel, investigators, or experts view the scene but the Defendant and/or his family members shall not be present at said viewing due to security risks and the concerns of the alleged victim's mother and sister who continue to reside at the scene. The State of Indiana may have its prosecuting attorney and/or a representative from the Indiana State Police present at the viewing. The Defense and its representatives shall remain within eyesight of the State and its representatives during their viewing while at the property but the Defense team may confer in private outside the hearing of the State and its representatives such as outside the residence.

12

The Court finds no authority allowing the Defense to privately search and impound evidence at a home that the Defendant no longer lives in and which is occupied by other tenants with privacy rights and rights to be free from annoyance, embarrassment, oppression, and/or undue burden. *Even Defense counsel admitted the request is a fishing expedition which this Court will not allow.* However, if there is a particular item in a known location the Defense wishes to discover, the Defense may request access to that item through the State and if the parties agree the item may be seized as evidence in the case.

If the parties do not agree, the parties may petition the Court for a hearing to determine whether the property should be seized. If potential evidence is seized, it shall be impounded and accounted for by the investigating agency in this case, the Indiana State Police. Nothing in this Order prevents the Defense from inspecting, measuring, surveying, and/or photographing the crime scene at its mutually agreed viewing of the property. However, the Defense shall not be allowed to conduct a general search of the residence, impound property at the residence, or test property at the residence without agreement of the State or prior Court approval. . . .

Appellee's App. pp. 124-25 (emphasis added).

This order clearly provides that the defense could discuss matters outside the presence of the police or prosecuting attorney. Shelby does not explain how simply having an agent of the State present at the scene allowed the State to observe his preparation and strategies. Shelby also claims that the trial court's ruling deprived him of the ability to "have the scene examined with fresh, unbiased eyes; to test the legal theories of the State's case and the testimony of would-be witnesses." Appellant's Br. p. 23. Again, a reading of the trial court's ruling shows that it did not deprive Shelby or his experts the right to examine the crime scene.[4] Shelby has not referred us to any authority, nor have we been able to find any authority, standing for the proposition that a defendant

---

[4] We also reject Shelby's implication that his examination of the scene would be "unbiased" and that the State's investigation was biased. The role of Shelby's defense was, rightly, to find weaknesses in the State's case, but this does not mean that Shelby's investigation would have been unbiased.

13

has a right to view the crime scene and collect evidence from the crime scene without the presence of an agent of the State.

Shelby also claims that, because he was not allowed to have unfettered, unsupervised access to the crime scene, Jessica was able to "s[ell], pawn[], burn[] or otherwise dispose[] of knives, clothing, and other items of property." Id. at 24. Jessica testified that, after Lexi's funeral, she had a bonfire at her house and burned some of Shelby's books and clothes, but packed up the remainder of his stuff. Tr. pp. 1335-36. However, there is no indication that any of these items were involved with the crime at issue. And Jessica testified that she sold Shelby's knife collection *before* Lexi's death. We fail to see how allowing Shelby unfettered, unsupervised access to the crime scene could have altered these already-accomplished acts.

Shelby notes that discovery should be reciprocal, a proposition with which we heartily agree. Shelby claims that the discovery in this case was not reciprocal because the State collected evidence that supported its theory of the crime. But this does not mean that the State was not properly reciprocal in the discovery process, as Shelby makes no argument that he was denied access to any of the evidence collected by the State.

With regard to Shelby's claim that he was not allowed to examine the crime scene for more than two years, we disagree. The trial court's order regarding the crime scene was entered on February 2, 2010, just a few weeks after the December 18, 2009 hearing on Shelby's November 20, 2009 motion to view the crime scene. While we might have preferred an elapsed time period of less than the actual six weeks between the filing of Shelby's motion and the court's ruling on it, we also note that several weeks of the

14

elapsed time included the Thankgiving and Christmas holidays. No matter these facts, however, Shelby could have examined the crime scene, in the presence of the prosecuting attorney or a member of the police, well before he finally did in June 2011.

The trial court's February 2, 2010 order regarding Shelby's access to the crime scene was entirely reasonable. It allowed Shelby supervised access to the crime scene and allowed his defense to consult outside the presence of the State. It also allowed Shelby to collect evidence. Moreover, the trial court noted that Shelby was admittedly on a "fishing expedition," a characterization which Shelby does not deny. Under these facts and circumstances, we are unable to say that the trial court's order in this matter amounted to an abuse of the considerable discretion trial courts have in such discovery matters.

## II. Denial of Certification for Interlocutory Appeal

Shelby next claims that the trial court erred in denying his motion to certify the trial court's February 2, 2010 order regarding the crime scene for interlocutory appeal. However, the trial court's order did not fall within the categories of orders from which an interlocutory appeal may be taken as of right. See Ind. Appellate Rule 14(A) (setting forth list of interlocutory orders from which appeal may be taken as of right). Thus, by definition, Shelby's ability to appeal this interlocutory order was *discretionary*. See Ind. Appellate Rule 14(B) (governing "Discretionary Interlocutory Appeals").

Certification of an order for discretionary interlocutory appeal is a "matter of grace" with the trial court. Dukes v. State, 661 N.E.2d 1263, 1268 (Ind. Ct. App. 1996). The decision of whether an order will be certified for interlocutory appeal is a matter within

15

the sound discretion of the trial court. Id. Accordingly, this court has held that a party does not have a constitutional right to a discretionary interlocutory appeal. Indiana Newspapers, Inc. v. Miller, 980 N.E.2d 852, 862 (Ind. Ct. App. 2012) (holding that non-party newspaper did not have a constitutional right to appeal trial court's interlocutory discovery order), aff'd on reh'g, trans. pending; see also Cua v. Morrison, 600 N.E.2d 951, 954 (Ind. Ct. App. 1992) (holding that party did not have a right to appeal interlocutory discovery order). Because Shelby had no right to an interlocutory appeal, we cannot say that the trial court committed any reversible error in denying Shelby's motion to certify its discovery order for interlocutory appeal.

### III. Cumulative Error

Shelby next contends that the combined effect of several errors, which by themselves might each be considered to be harmless, resulted in cumulative error. Our supreme court has held out the possibility that, "under some circumstances, the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation[.]" Hubbell v. State, 754 N.E.2d 884, 895 (Ind. 2001) (considering the question *arguendo*). We therefore address each of Shelby's alleged errors in turn.

A. *Withholding Evidence Favorable to the Defense*

Shelby claims that the State deliberately withheld certain evidence that was potentially exculpatory in violation of Brady v. Maryland, 373 U.S. 83 (1963). To prevail on a Brady claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the suppressed evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. Bunch v. State, 964 N.E.2d 274, 297 (Ind. Ct.

16

App. 2012), trans. denied. Evidence is "material" under Brady only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. And a "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id. However, the State will not be found to have suppressed material evidence if it was available to a defendant through the exercise of reasonable diligence. Id.

Here, Shelby claims that he was denied access to the statement of Donna English, who worked at the BP gas station that Shelby claimed had a broken credit card reader when he spoke to Jessica on the night of the murder. Shelby claims that he was not provided with a copy of Ms. English's statement and, that when he inquired, he was told by the State that there was no such statement. When Shelby's defense counsel sent an investigator to interview Ms. English, he learned that Detective Gardner had interviewed her. Ms. English claimed that someone had reported that the credit card reader was not working and that a woman, presumably Jessica, had called to see if the card reader was in fact not working.

At trial, Detective Gardner testified that he had interviewed Ms. English with regard to the credit card reader, and explained that Ms. English had stated that she "wasn't sure if they had a problem [with the credit card reader] or not." Tr. p. 850. Because of this, and because Detective Gardner believed that Shelby had not been lying about the credit card reader, he did not file a supplemental report regarding his interview with Ms. English. At trial, Ms. English testified that someone had called the gas station the night of the murder and asked if the credit card reader was working and was told that

17

it was working.  Ms. English further testified that only once on the day of the murder had the gas station's equipment been unable to read and process a credit card transaction.

We agree with the State that these facts and circumstances do not establish a Brady violation.  The evidence regarding the possible inoperability of the credit card reader may have been "favorable" to the defense.  See Bunch, 964 N.E.2d at 297-98 (noting that favorable evidence includes both exculpatory and impeachment evidence).  However, the question of whether the credit card reader was working was *not* material to an issue at trial.  Although Detective Gardner testified that he had not believed Shelby was lying with regard to the credit card reader, Shelby himself told the police in his second statement that he had been lying about the credit card reader and had never even gone to the BP station that night.  Further, the evidence was available to Shelby through the exercise of reasonable diligence.  Indeed, Shelby was able to procure Ms. English's statement prior to trial.  Accordingly, we conclude that there was no Brady violation on this issue.

B.  *The Police Investigation*

Shelby's next claim of error is a broad and rambling accusation that the police failed to properly investigate the crime.  He complains that the police did not adequately investigate other suspects, specifically Jessica and Gunter.  We agree with the State, however, that these are issues that should have been, and in fact were, presented to the jury to undermine the State's case. Shelby's trial counsel pointed out inconsistencies in Gunter's statements and Jessica's statements and presented evidence that Lexi had violently confronted Jessica and that Jessica had a history of mental health problems.

18

Shelby's claim that the police "rushed to judgment" in their decision to regard to him as the principal suspect was an issue to present to the trier of fact; it does not establish legal error on appeal.

C. *Presentation of "Corrupt" Testimony*

Shelby also claims that the presentation of certain evidence at trial was improper. Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. Rogers v. State, 897 N.E.2d 955, 959 (Ind. Ct. App. 2008), trans. denied. A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Id.

Shelby notes that Gunter testified at trial that, on the night of the murder, he saw a man peek his head around the corner of the house while Gunter was talking with Lexi. Gunter testified at trial that this man had "[s]horter hair and kinda ruggedness right there . . . a little bit dark right there. I can't—he didn't have a full fledged beard, but it was rugged and ain't no woman going to have ruggedness and stuff." Tr. p. 1139 (ellipses in original).[5] Shelby claims that Gunter gave this description after being shown a photograph taken of Shelby months after Lexi's death, in which Shelby appears to have a growth of facial hair. Shelby notes that, according to Jessica, at the time of Lexi's death, Shelby was actually clean shaven and had recently shaved his head. Shelby

---

[5] Based on the context of Gunter's testimony, and his further testimony, his reference to "ruggedness" was a reference to a growth of facial hair. When asked on cross-examination what he meant by "rugged," Gunter testified, "I mean it was like . . . starting to grow whiskers and stuff where it would be a little bit darker." Tr. p. 1147.

therefore concludes: "Jessica and Gunter's statements were in direct conflict when they described Gunter's arrival at the Shelby residence on the night of Alexis' death clearly indicating that one or both of them was lying." Appellant's Br. p. 29.

The fact that one witness's testimony may be inconsistent with that of another witness is not cause for the exclusion of either witness's testimony, and under the facts and circumstances before us, does not call the integrity of the prosecuting attorney into question. Such inconsistencies go only to the weight of such evidence, not its admissibility. Jenkins v. State, 809 N.E.2d 361, 373 (Ind. Ct. App. 2004) (citing Craig v. State, 515 N.E.2d 862, 864 (Ind. 1987)). Therefore, the trial court did not abuse its discretion in the admission of this testimony.[6]

D. *Jury Instructions*

Shelby next claims that the trial court erred by failing to give certain jury instructions that he tendered. The instruction of the jury lies within the trial court's sound discretion, and we review the trial court's refusal to give a tendered instruction for an abuse of that discretion. Weida v. State, 778 N.E.2d 843, 847 (Ind. Ct. App. 2002). To determine whether the trial court abused its discretion when it refused to give a tendered instruction we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record supporting the instruction; and (3) whether the substance of the instruction is covered by other instructions. Id. When a defendant seeks reversal

---

[6] Although Shelby refers in the heading of his argument to hearsay testimony, he presents no actual argument that the testimony he complains of was hearsay.

based on instructional error, he must demonstrate a reasonable probability that substantial rights of the complaining party have been adversely affected. Id.

In his Appellant's Brief, Shelby quotes verbatim the seven instructions he claims the trial court should have given to the jury. He then writes:

> The State's objection to these instructions was "they are not pattern instructions." This objection is vague, illusory, and does not begin to address the factors that should be considered in determining what instructions should or should not be given. [Shelby]'s tendered instructions were not adequately covered by other instructions, especially those related to the issues of confessions and the voluntariness of a confession, and they were correct statements of the law. [Shelby] was entitled to have these instructions read to the jury, and failure to do so failed to properly protect his rights.

Appellant's Br. p. 33 (citations omitted).

At no point does Shelby explain why his instructions were a correct statement of the law or compare his tendered instructions to those actually given by the trial court. Although Shelby's proposed instructions contain citations to various cases at the end of each instruction, Shelby does not discuss or address those cases or explain why they support the tendered instructions. He does not even provide a citation to that portion of his appendix where we might find his tendered instructions. See Haddock v. State, 800 N.E.2d 242, 245 n.5 (Ind. Ct. App. 2003) (noting that court on appeal will not sift through the record to find a basis for a party's argument).[7] Nor does Shelby explain why or how the instructions given by the trial court did not cover the substance of his tendered instructions. We therefore consider this argument to be waived for purposes of appellate

---

[7] This is especially true in a case such as the present one, where the transcript alone consists of almost 2000 pages and the exhibits volume and appendices are similarly sized.

21

review. See Davis v. State, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (concluding that defendant's argument that tendered jury instruction was a proper statement of law was waived where he cited no authority in support of his position); Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on[.]").[8]

Waiver notwithstanding, Shelby would still not prevail. The first instruction he claims should have been given, labeled as Defendant's Tendered Instruction No. 2, explained to the jury that they could consider the character evidence presented by Shelby in determining his guilt or innocence:

> The Accused has called witnesses who have given their opinion of his/her good character. This testimony is not to be taken by you as the witness' opinion as to whether the Accused is guilty or not guilty. That question is for you alone to determine. You should, however, consider this character evidence together with all the other facts and all the other evidence in the case in determining whether the Accused is guilty or not guilty. Such character evidence may indicate to you that it is improbable that a person of good character would commit the offense charged. Accordingly, if after considering the question of the Accused's good character, you find a reasonable doubt has been created, you must acquit him/her of all the charges. On the other hand, if after considering all the evidence including that of Accused's character, you are satisfied beyond a reasonable doubt that the Accused is guilty, you should not acquit the Accused merely because you believe him/her to be a person of good character.

Appellant's Br. p. 20.

---

[8] Not only does Shelby not explain how the authorities cited in his tendered instructions support the statements of law contained in his instructions, he even fails to cite to where such support may be found in the cited cases. This too is improper. See Haddock, 800 N.E.2d at 245 n.5 (noting that court on appeal will not search through the authorities cited by a party in order to try to find legal support for the party's position).

The Court in the first case referenced in Shelby's tendered instruction, <u>Michelson</u> <u>v. United States</u>, 335 U.S. 469 (1948), simply noted the common-law rules regarding the admissibility of character evidence and held that the District Court in that case had not erred by allowing the Government to rebut the defendant's character evidence by referring to his prior arrest. <u>Id</u>. at 473-480, 486-87.

Shelby's citation to <u>Carroll v. State</u>, 438 N.E.2d 745 (Ind. 1982), in his tendered instruction is similarly unavailing. In that case, our supreme court held that the following instruction by the trial court was a proper statement of the law:

> The defendant has introduced evidence of his reputation for peaceability and honesty. This evidence may be sufficient when considered with the other evidence in the case to raise a reasonable doubt of the defendant's guilt.
>
> However, if from all the evidence in the case you are satisfied beyond a reasonable doubt of the defendant's guilt, then it is your duty to find him guilty, even though he may have a good reputation.

438 N.E.2d at 748. Although Shelby's proposed instruction contains similar language, it also contains other language not included in the instruction which passed muster in <u>Carroll</u>. Also, we cannot overlook the fact that instructions which unnecessarily emphasize specific pieces of evidence or witnesses are disfavored. <u>Ham v. State</u>, 826 N.E.2d 640, 641-42 (Ind. 2005); <u>Ludy v. State</u>, 784 N.E.2d 459, 461 (Ind. 2003). Accordingly, we cannot say that the trial court erred in refusing to give Shelby's tendered instruction.

The next instruction Shelby claims should have been given, Defendant's Tendered Instruction No. 4, provided:

Confessions, even those found to be voluntary, are not conclusive of guilt. And, as with any other part of the State's case, a confession may be shown to be insufficiently corroborated or otherwise unworthy of belief.

Appellant's Br. p. 30. The trial court gave an instruction, Court's Instruction No. 20, regarding Shelby's confession, which informed the jury:

Evidence has been introduced that the Defendant made a statement concerning the crime charged. It is for you to determine, in light of all the circumstances under which the statement was made, if it was properly obtained by the police, prosecutor, or law enforcement. The law does not allow the police, prosecutor, or law enforcement to obtain a statement by abuse, threats, duress, or violence or false promises. If you find that the police, prosecutor, or law enforcement obtained the statement by such means, you should not consider the statement as evidence against the Defendant. If you find from a consideration of all the evidence that the statement was properly obtained by the police, prosecutor, or law enforcement, then it is for you to determine what value should be given to the statement.

Appellee's App. p. 669. Because the substance of Shelby's tendered instruction was covered by this instruction given by the trial court, the trial court did not err in refusing Shelby's instruction.

The same is true of Defendant's Tendered Instruction No. 5, which informed the jury that it should not consider Shelby's confession if it was involuntary. This was covered by the Court's Instruction No. 20. Shelby's tendered instruction did list several factors the jury could consider in determining whether the confession was voluntary, which were not included in the given instruction. But the case cited in support of the tendered instruction, Miller v. State, 770 N.E.2d 763 (Ind. 2002), did not even involve the issue of how to instruct the jury; it simply listed factors a trial court should consider in deciding whether to admit a defendant's statement. Id. at 767. The fact that certain

24

language or expression is used in the opinions of this court or our supreme court to reach a final conclusion does not make it proper language for instructions to a jury. Ludy, 784 N.E.2d at 462. Thus, there was no error in refusing Defendant's Tendered Instruction No. 5.

Shelby also claims that the trial court erred in refusing three of his tendered instructions, Tendered Instructions Nos. 6, 7, and 10, which respectively covered the possible verdicts, the requirement of jury unanimity, and an admonition that the mere suspicion of guilt was insufficient to support a conviction. See Appellant's Br. pp. 31-32. The substance of these instructions was covered by the trial courts Instructions Nos. 4, 5, and 15.

The Court's Instruction No. 4 explained to the jury that it could find Shelby guilty only if it found that the State proved every essential element of the crime beyond a reasonable doubt, that Shelby was presumed innocent, that the burden of proof rested entirely on the State, and that if the State failed to prove every essential element of the crimes charged beyond a reasonable doubt, the jury was required to find Shelby not guilty. Appellee's App. p. 652. The Court's Instruction Nos. 5 and 15 defined reasonable doubt and explained to the jury that it could not convict based on suspicion or speculation, and again informed the jury that if there was a reasonable doubt that the Shelby was guilty, it was required to give him the benefit of that doubt and find him not guilty. Id. at 653, 664. Because the substance of Shelby's tendered instructions was covered by the instructions given by the trial court, there was no error in refusing Shelby's tendered instructions.

25

Lastly, Shelby claims that the trial court erred in refusing his Tendered Instruction No. 9, which provided:

> The law presumes that Ryan Shelby is a person of good character and in this case I instruct you that you should consider the evidence in the light of this presumption. You, the jury, are the judges of the weight to be given to such a presumption. You may find Ryan Shelby guilty only if, after a full consideration of all the evidence and the presumption, you find that the State has proven each element of the offense beyond a reasonable doubt.

Appellant's Br. p. 32. The jury was well instructed that Shelby was presumed innocent and did not have to prove anything. They were also instructed that they were the exclusive judges of the credibility of witnesses, and that they were duty bound to reconcile all statements of witnesses on the theory that Shelby was innocent and that all witnesses were truthful. Appellee's App. pp. 655, 666. And, as noted above, the jury was repeatedly instructed on the State's burden to prove every essential element of the crimes charged beyond a reasonable doubt. Id. at 652-53, 664. The trial court was well within its discretion to refuse Shelby's tendered instructions. Thus, the manner in which the trial court instructed the jury did not contribute to any cumulative error.

### E. *Prosecutorial Misconduct*

Shelby next claims that prosecutorial misconduct contributed to the cumulative error he claims requires reversal. To preserve a claim of prosecutorial misconduct, the defendant must object and request an admonishment. Nunley v. State, 916 N.E.2d 712, 721 (Ind. Ct. App. 2009), trans. denied. If the objecting party is not satisfied with the admonishment, the proper procedure is to move for a mistrial. Id. Failure to request an admonishment or move for a mistrial results in waiver of the issue on appeal. Id.

26

Although it appears that Shelby made some objections at trial to the behavior he now claims constituted misconduct, he does not refer us to any portion of the record wherein he requested an admonishment or moved for a mistrial. His claims of prosecutorial misconduct are therefore waived.

Where a claim of prosecutorial misconduct has been properly preserved, the reviewing court must determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. Coleman v. State, 946 N.E.2d 1160, 1166 (Ind. 2011). But where, as here, a claim of prosecutorial misconduct has not been properly preserved, the defendant must establish not only the grounds for the misconduct, but also the additional grounds of fundamental error. Id.

The fundamental error exception to the waiver rule is an extremely narrow one. Munford v. State, 923 N.E.2d 11, 13 (Ind. Ct. App. 2010). To rise to the level of fundamental error, the error complained of must be so prejudicial to the rights of the defendant as to make a fair trial impossible. Id. Specifically, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process. Id.

Shelby first claims that the prosecutor engaged in misconduct by objecting when Shelby's trial counsel played recordings of telephone calls received by the Sheriff's Department in which Jessica and Lexi reported that they had been fighting. Shelby introduced this evidence to impeach Jessica's testimony that she and Lexi had a good relationship. The State objected on the grounds that playing the telephone calls was

27

"cruel" to Jessica and that the calls were irrelevant. Tr. pp. 1459-60. The trial court overruled the State's objection. Shelby wholly fails to explain how this objection by the State constitutes misconduct, especially in light of the fact that the State's objection was overruled. Moreover, to the extent that the State used the word "cruel" in its objection, we fail to see how this subjected Shelby to a position of grave peril.

Shelby also claims that the prosecutor committed misconduct by objecting to his counsel's cross-examination of Jessica as being argumentative. As noted by the State, however, several of these objections were sustained, and Shelby makes no argument that the trial court erred in sustaining these objections. Moreover, the jury was instructed that:

> [t]he questions, statements, and arguments of counsel relative to the admission of evidence transpiring in your hearing will be directed to the Court and for the consideration of the Court alone and not the jury, for the purpose of enabling the Court to determine the admissibility thereof, and it is not proper for you to consider, in passing on the guilt or innocence of the defendant, anything transpiring in your presence, except such as has been admitted and introduced into evidence.

Appellee's App. p. 656. We therefore cannot say that the State's objections placed Shelby in a position of grave peril.

Shelby also complains that the prosecutor committed misconduct when it responded to Shelby's objection to the admission of photographs of Lexi's body. Shelby objected at trial that the photographs were "extremely gruesome" and were duplicative of other exhibits. Tr. p. 299. The State responded that the photographs were being admitted to show Lexi's injuries and to show the amount of blood that had soaked into her clothing, to counter statements by Shelby's counsel that there should have been more blood at the scene. Id. The State then observed that our supreme court has noted that "revolting

28

crimes generate revolting evidence." Id. (referring to Perigo v. State, 541 N.E.2d 936, 940 (Ind. 1989)). It is undeniable that Lexi was brutally murdered. Indeed, Shelby's counsel objected on the basis that the photographs were "gruesome." The fact that the State noted that Lexi's murder was "revolting" did not constitute misconduct. And again, the jury was instructed that the comments of counsel were not evidence and were not to be considered by the jury. Shelby was not subject to grave peril by the prosecutor's comments.

Upon comprehensive review of these claims, we find none to be supported by the record or the law. Because none of the errors complained of by Shelby actually constituted error, it logically follows that these alleged errors, when considered cumulatively, do not require reversal of Shelby's convictions.

### IV. Admission of Defendant's Statement to Police

Next, Shelby argues that the trial court erred in admitting into evidence his statement to the police in which he admitted that he stabbed Lexi. As noted above, questions regarding the admission of evidence are left to the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. Rogers, 897 N.E.2d at 959.

When a defendant challenges the voluntariness of his confession under the United States Constitution,[9] the State must prove by a preponderance of the evidence that the

---

[9] Shelby makes no argument that his statement was involuntary under the Indiana Constitution.

statement was voluntarily given.[10] Pruitt v. State, 834 N.E.2d 90, 114 (Ind. 2005). Coercive police activity is a prerequisite to finding a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. Scalissi v. State, 759 N.E.2d 618, 621 (Ind. 2001). A confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. Id. The critical inquiry is whether the defendant's statements were induced by violence, threats, promises, or other improper influence.

In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including: the crucial element of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health. Pruitt, 834 N.E.2d at 115. Other factors that can influence the voluntariness of a confession include the use of alcohol or drugs and fatigue. Id.

On appeal, the reviewing court will not reweigh the evidence; instead we examine the record for substantial, probative evidence of voluntariness. Id. We consider the evidence most favorable to the trial court's conclusion, together with the reasonable

---

[10] Shelby claims that the trial court relieved the State of this burden when it excluded portions of the testimony of its expert witness. But it is obvious that the question of the admissibility of Shelby's confession was a question for the trial court, not the jury, and we fail to see how the exclusion of portions of the trial testimony of Shelby's expert witness has any bearing on the admissibility of his confession. To the extent that this is just a foreshadowing of Shelby's argument that the trial court abused its discretion in limiting the testimony of his expert witness, we address this contention below. To the extent that Shelby's claim is that the trial court improperly excluded evidence at the suppression hearing, it is waived for failure to present a cogent argument.

inferences that can be drawn therefrom. Id. And if there is substantial evidence to support the trial court's conclusion, we will not set it aside. Id.

Here, Shelby claims that his confession was involuntary because the interrogating officers used psychological intimidation and deceptive interrogation techniques. Shelby specifically complains that the police used the "Reid technique"[11] to question him, lied about the evidence they had implicating him, and repeatedly told him that they would "help" him if he cooperated with the police.

However, it has been held that urging a suspect to help himself by telling the police the truth does not constitute a promise of leniency. Turner v. State, 682 N.E.2d 491, 494-95 (Ind. 1997). Indeed, had Shelby acted in self-defense, he could have helped himself by explaining why he had stabbed Lexi. Further, none of the examples listed by Shelby where the police urged him to "help" himself rise to the level of a promise of leniency or to mitigate punishment.[12] See Malloch v. State, 980 N.E.2d 887, 902 (Ind. Ct. App. 2012) (holding that detective's statements to defendant were too vague and indefinite to constitute promises of leniency or mitigated punishment where detective told

---

[11] Our court has explained the Reid technique before: "The first phase of the Reid Technique consists of nonaccusatory questioning. The interview then shifts to the second phase, where the questioner does most of the talking and claims that the investigation clearly shows that the suspect committed the crime. A questioner using the Reid Technique introduces different minimizing themes, in essence excuses or justifications, to make it easier and more comfortable for the suspect to admit to the crime." Malloch v. State, 980 N.E.2d 887, 893 (Ind. Ct. App. 2012) (internal quotations omitted).

[12] The detectives' statements referred to by Shelby include: "God help you because I can't, I can help you now but I cannot help you at that time," "Now did [Lexi] come at you first because that's going to be big. That's going to be big. I told you I wouldn't lie to you. I've told you the promises I can make," "It was either an accident, it was self-defense, or it was cold blooded murder, and I've got to know what happened back there or I can't do anything for you," "You have got to let me help you, man. You have got to let me help you," and "If we don't help you, you're going to be pinned as that murderer, that serial killer, the guy who premeditated this, who hated his daughter enough to kill her." Appellant's App. pp. 191, 199, 217, 260.

31

defendant that if he accepted responsibility for his crime it would show the judge that he was remorseful); Clark v. State, 808 N.E.2d 1183, 1191 (Ind. 2004) (holding that interrogating officer's statements to defendant that "there's a way you can work around this" and that defendant would have no future unless he was honest about what had happened did not constitute a promise or threat that rendered defendant's confession involuntary); cf. McGhee v. State, 899 N.E.2d 35, 39 (Ind. Ct. App. 2008) (holding that defendant's confession that he had sex with his niece was involuntary where interrogating detective falsely told him that having sex with his niece was not a crime if she was an adult and the act was consensual when, in fact, the act constituted the crime of incest).[13] Moreover, the interrogating officers here explained to Shelby that they could *not* promise Shelby that he would not be "in trouble" for what he did. See Ex. Vol. State's Ex. 5 at 3:51:59.

Nor does the fact that the police lied about the amount of evidence that implicated Shelby mean that his confession was involuntary. See Henry v. State, 738 N.E.2d 663, 664-65 (Ind. 2000) (holding that defendant's confession was voluntary even though interrogating officers falsely told defendant that his fingerprints were found at the crime scene and that a witness to the crime had identified the defendant); Malloch, 980 N.E.2d at 903 (holding that even though interrogating officer repeatedly and falsely asserted that

---

[13] The majority opinion in McGhee cited Ashby v. State, 265 Ind. 316, 320–21, 354 N.E.2d 192, 195 (1976) for the proposition that a confession obtained by *any* promises, direct or implied, is not free and voluntary. See McGhee, 889 N.E.2d at 38. Judge Bradford dissented and noted that our supreme court has subsequently held that *implied* promises are too indefinite to render a confession involuntary. Id. at 40 (Bradford, J., dissenting) (citing Gary v. State, 471 N.E.2d 695, 698 (Ind. 1984); Collins v. State, 509 N.E.2d 827, 830 (Ind. 1987)).

his investigation clearly established that defendant had intentionally touched child victim, this falsehood did not render defendant's confession involuntary).

Still, Shelby claims that his confession was involuntary because of the circumstances surrounding his interrogation, such as the length of the interrogations, his alleged lack of sleep, and that he was not read his Miranda rights during his first interview with the police. Shelby was questioned three separate times. The first occurred at the local city hall, shortly after the police had discovered Lexi's body and had taken control of Shelby's home as a crime scene. Shelby was not Mirandized during this questioning, as he was not yet a suspect. But Shelby did not admit any involvement in Lexi's death during this interview. The second interview occurred the following morning, approximately six hours after the first interview. Before being questioned, Shelby was advised of his Miranda rights,[14] yet still spoke with the police without requesting counsel. Even when the police told him he was a suspect and confronted him with evidence indicating his involvement, Shelby denied that either he or his wife had been involved with Lexi's death.

The third and final interview occurred the following day, November 4, 2009. Shelby was again informed of his Miranda rights, both orally and in writing. Still, he chose to speak with the police and did not request counsel. Nor did he request that the

---

[14] Shelby also claims that he was not told that he could not be compelled to give a statement incriminating himself. However, Detective Gardner and State Police Trooper Dan Gress both testified at the motion to suppress hearing that they did advise Shelby of his Miranda rights, and these advisements included: that Shelby had the right to remain silent and not answer any questions, that anything Shelby said could be used against him, that Shelby had the right to a lawyer and have a lawyer present during questioning, that if Shelby could not afford a lawyer, one would be appointed for him, and that Shelby could discontinue the questioning at any time and speak with a lawyer. This clearly informed Shelby that he could not be compelled to give a statement incriminating himself.

police stop questioning him or assert his right to remain silent. He was given two breaks to smoke and walk. Indeed, when Shelby asked if he could "get out" of the interrogation room, he was given a break. Although Shelby initially maintained his innocence, he later admitted that he had stabbed Lexi after she had come at him with a knife.

Shelby was thirty-two years old at the time of the interview, he could speak and write in English, and had graduated from high school and had attended some college classes. He was a Navy veteran who had received training in aviation electronics. He had slept and eaten breakfast the day of the interview. He was not in poor health, nor was he intoxicated. Considering the evidence favorable to the trial court's decision and the reasonable inferences to be drawn therefrom, the trial court did not err in concluding that the totality of the circumstances show that Shelby's statement to the police was given voluntarily. See Malloch, 980 N.E.2d at 902-04 (concluding that there was substantial evidence supporting trial court's decision that defendant's statement to the police was voluntary even though the interrogating officer lied to the defendant, indicated that he could help himself by cooperating with the police, and where interrogation was "confrontational and intense.").

### V. Exclusion of Evidence

Of course, the fact that Shelby's confession was admissible does not mean that Shelby's counsel was prohibited from attacking the reliability of the confession at trial in order to convince the jury that the confession was false or unreliable. Indeed, Shelby's trial counsel did exactly this, which leads us to Shelby's next contention of error: that the

trial court abused its discretion when it excluded portions of the testimony of his expert witness regarding the phenomenon of false confessions.

Shelby contends that the trial court erred in sustaining the State's objection to certain testimony from Dr. Richard Leo ("Dr. Leo"). Dr. Leo is an expert in the field of false and/or coerced confessions. It is notable that the trial court did not exclude Dr. Leo's testimony in whole. Instead, Dr. Leo was permitted to testify at some length regarding false confessions and the methods police use during interrogation. He also testified regarding what he considered problems with the Reid technique used by the police who interrogated Shelby. But the trial court sustained the State's objection when Shelby's counsel asked Dr. Leo if he thought that the tactics used by the police when interrogating Shelby were coercive. See Tr. pp. 1259, 1263.

Shelby then made an offer of proof, demonstrating that Dr. Leo would have testified that several of the techniques used by the police while interrogating Shelby were consistent with the sort of factors that increase the risk of eliciting a false confession, including: suggesting that the crime was either self-defense or a horrible murder, thus suggesting that if Shelby admitted to killing Lexi, he might not be subject to criminal liability; the lengthy and repetitive nature of the interrogations; and lying about the amount of evidence implicating Shelby. Tr. pp. 1266-72. Dr. Leo also testified during the offer of proof that this sort of information with regard to false confessions is not well known to the general public.

Shelby claims that the exclusion of this evidence was reversible error. In support of his claim, Shelby relies upon the decision of our supreme court in Miller v. State, 770

35

N.E.2d 763 (Ind. 2002), which in turn cited with approval the opinion of this court in Callis v. State, 684 N.E.2d 233, 239 (Ind. Ct. App. 1997), trans. denied.

In Callis, the defense sought to introduce the testimony of an expert witness regarding coercive police interrogation and the phenomenon of false or coerced confessions. The State did not object to the witness's testimony on the general subjects of coercive police interrogation and false or coerced confessions, but did object when the witness was asked his opinion about the interrogation process utilized in that particular case. The trial court sustained the State's objection on grounds that the proposed testimony violated Indiana Evidence Rule 704(b).[15] On appeal, Callis argued that the proffered testimony "merely concerned the reliability of the interrogation process, not the truthfulness of witnesses[.]" Callis, 684 N.E.2d at 239. This court held that the trial court properly admitted the witness's testimony about the phenomenon of coerced confessions, but also that it properly excluded the witness's opinions about Callis's interrogation. Id. This was based upon the conclusion that the purpose of the excluded testimony was to express an opinion concerning who was telling the truth about Callis's statements, which is not admissible pursuant to Evidence Rule 704(b).

Our supreme court later addressed a similar issue in Miller. In that case, the defendant had retained an expert witness—in fact the same expert witness who testified in Callis's trial. The trial court had granted the State's motion in limine to exclude defendant's expert witness from testifying with regard to the interrogation process used in

---

[15] This rule provides, "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Evid. R. 704(b).

36

that case and regarding the truthfulness of the defendant's confession. Miller, 770 N.E.2d at 770. The trial court preliminarily granted the motion, but indicated it would reconsider its ruling when the expert witness arrived, at which time the court would hear the expert's testimony out of the jury's presence, reconsider the motion, and rule thereon. Id.

Subsequently, outside the presence of the jury, Miller called his expert witness and asked whether the interrogating officer's testimony "provided any characteristics . . . or phenomena of false confessions or police interrogation in your area of study[.]" Id. at 771. The witness testified regarding specific tactics used during that interrogation. The trial court, concerned that the witness's testimony would be questioning the veracity of another witness, excluded the expert's testimony in whole. On appeal, our supreme court held that the trial court had erred by prohibiting the witness from testifying altogether. Id. After discussing the holding in Callis, the court wrote, "We understand Callis to prohibit expert opinion testimony regarding the truth or falsity of one or more witnesses' testimony, but it does not generally prohibit expert testimony regarding police techniques used in a particular interrogation." Miller, 770 N.E.2d at 773.

The Miller court then held that the substance of the expert witness's opinion would have assisted the jury regarding "the psychology of relevant aspects of police interrogation and the interrogation of mentally retarded persons, topics outside common knowledge and experience."[16] 770 N.E.2d at 774. The court did not dismiss the concerns regarding the invasion of the province of the jury to determine witness

---

[16] The defendant in Miller was mentally retarded. Id. at 770.

37

credibility, and it noted that if portions of the expert's testimony "would have invaded Rule 704(b)'s prohibition of opinion testimony as to the truth or falsity of the defendant's statements, the trial court could have sustained individualized objections at trial," rather than wholly excluding the expert's testimony. Id. The court also determined that the trial court's error in wholly excluding the expert witness's testimony was not harmless. Id.

We understand the Miller court's general approval of Callis to mean that experts may testify on the general subjects of coercive police interrogation and false or coerced confessions. Miller, 770 N.E.2d at 773. Experts may also testify regarding the techniques the police used in a particular interrogation. Id. Experts may not, however, comment about the specific interrogation in controversy in a way that may be interpreted by the jury as the expert's opinion that the confession in that particular case was coerced or false, as this would invade the province of the jury and violate Evidence Rule 704(b).

Applying this reading to the facts of the present case, it is not readily clear whether the trial court erred in excluding portions of Dr. Leo's testimony. The trial court permitted Dr. Leo to testify at length regarding the tactics that increase the risk of a coerced confession or a false confession. Thus, the facts of the present case align more with what occurred in Callis than what occurred in Miller. The trial court here, unlike the trial court in Miller, did not wholly exclude the expert witness's testimony regarding the phenomenon of false confessions and the tactics that can lead thereto. Instead, like the trial court in Callis, the trial court here excluded only those portions of the expert's testimony that dealt with the specifics of the police interrogation of the defendant. But

Miller specifically held that an expert could testify "regarding police techniques used in a particular interrogation." Miller, 770 N.E.2d at 773.

However, even if the court erred in limiting Dr. Leo's testimony, the error would not require reversal. Dr. Leo was allowed to testify at length about police interrogation tactics that can increase the risk of a false or coerced confession. The jury was also presented with extensive evidence regarding the police interrogations of Shelby in written, video, and audio formats, and could observe whether his interrogation included the tactics and techniques that Dr. Leo testified could lead to a false or coerced confession. Thus, the jury was able to apply the concepts about which Dr. Leo testified to the facts and circumstances of Shelby's interrogation and subsequent confession. This is all that Dr. Leo could have testified to under our reading of Miller and Callis. Shelby's counsel also cross-examined Detective Gardner at length regarding the Reid technique and the tactics he used while interrogating Shelby. He also explored the inconsistencies between Shelby's confession and the physical evidence presented by the State at trial. Under these facts and circumstances, we conclude that the trial court's limitations of Dr. Leo's testimony did not amount to reversible error.

## VI. Residual Doubt

Finally, Shelby claims that the trial court failed to consider his proffered mitigator of "residual doubt"[17] when imposing sentence. However, as noted by the State, Shelby has failed to provide us with a transcript of the sentencing hearing, and we are therefore

---

[17] See Dumas v. State, 803 N.E.2d 1113, 1119 (Ind. 2004) (describing residual doubt as "when a jury finds a defendant guilty beyond a reasonable doubt, there still may be a measure or residuum of doubt about the defendant's guilt") (quoting Miller v. State, 702 N.E.2d 1053, 1069 (Ind. 1998)).

unable to adequately review this claim regarding what the trial court did and did not consider in imposing sentence. See Lightcap v. State, 863 N.E.2d 907, 911 (Ind. Ct. App. 2007) (noting that it is the appellant's duty to present an adequate record clearly showing the alleged error).

Moreover, even if the trial court did abuse its discretion by failing to consider the alleged mitigating factor of residual doubt, this does not require remand for resentencing. See Chappell v. State, 966 N.E.2d 124, 134 n.10 (Ind. Ct. App. 2012) (noting that any error in sentencing is harmless if the sentence imposed is not inappropriate), trans. denied; see also Windhorst v. State, 868 N.E.2d 504, 507 (Ind. 2007) (noting that when trial court errs in sentencing defendant, court on appeal may exercise authority to review and revise sentence, instead of remanding for resentencing); Mendoza v. State, 869 N.E.2d 546, 556 (Ind. Ct. App. 2007) (noting that even if trial court abuses its discretion in sentencing, we will not remand for resentencing if the sentence imposed is not inappropriate), trans. denied.

Pursuant to Appellate Rule 7(B), we may revise a sentence otherwise authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Although we have the power to review and revise sentences, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008).

Here, the trial court imposed the advisory sentence of fifty-five years. We are unlikely to consider an advisory sentence inappropriate. See Fernbach v. State, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011) (noting that because the advisory sentence is the starting point our General Assembly has chosen as an appropriate sentence for the crime committed, a defendant sentenced to the advisory term bears a particularly heavy burden in persuading court on appeal that his sentence is inappropriate). And here, the heinous nature of the crime is itself sufficient to support the trial court's decision to impose the advisory sentence. The jury found beyond a reasonable doubt that Shelby attacked his stepdaughter, who considered him to be her father, slit her throat with a knife, and then continued to stab her multiple times in the neck. He then dragged her body behind a shed and fled the scene. Shelby's sentence is not inappropriate. Thus, even if the trial court had improperly overlooked Shelby's proposed mitigator, we would not remand for resentencing. See Chappell, 966 N.E.2d at 134 n.10; Windhorst, 868 N.E.2d at 507.

**Conclusion**

The trial court did not abuse its discretion in denying Shelby's motion to view the crime scene, nor did the trial court's denial of Shelby's motion to certify its order for interlocutory appeal constitute reversible error.

As to alleged cumulative error, there was no Brady violation. The manner in which the police chose to investigate the crime does not constitute legal error on appeal. The presentation of inconsistent testimony is a factual issue for the trier of fact to resolve. The trial court did not err in instructing the jury. The prosecutor did not engage in

41

misconduct. Thus, since none of Shelby's claims of error were in fact error, there was no cumulative effect of these alleged errors requiring reversal.

The trial court did not abuse its discretion in admitting Shelby's statements to the police. And to the extent that the trial court erred in limiting the testimony of Shelby's expert witness, the error was harmless in light of the testimony that was presented by the witness.

Lastly, even if the trial court did abuse its discretion in failing to consider Shelby's proffered mitigator of "residual doubt," we would not remand for resentencing because Shelby's advisory sentence of fifty-five years for the brutal murder of his stepdaughter is not inappropriate.

Affirmed.

KIRSCH, J., and CRONE, J., concur.