## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 26 2016, 9:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Philip A. Garrett,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 26, 2016

Court of Appeals Case No.
49A05-1509-CR-1380

Appeal from the Marion Superior Court

The Honorable Marc T. Rothenberg, Judge

Trial Court Cause No.
49G02-1306-MR-036144

**Mathias, Judge.**

Philip A. Garrett ("Garrett") was convicted in Marion Superior Court of murder. Garrett appeals and presents three issues for our review, which we restate as:

I. Whether the trial court abused its discretion when it permitted a witness to testify that Garrett had previously made a statement that his ex-girlfriend's new boyfriends would start to "disappear";

II. Whether the trial court committed fundamental error in instructing the jury regarding the elements of murder, voluntary manslaughter, and self-defense; and

III. Whether the prosecuting attorney's statements regarding sudden heat during the State's closing arguments constitutes fundamental error.

We affirm.

## Facts and Procedural History

In 2012, Garrett began a romantic relationship with Laprecious Epps ("Epps"). Epps had been living with her long-time friend Jantitta Barlow ("Barlow"), but Barlow moved back in with her father when Garrett moved in with Epps. Epps and Garrett lived together until October 2012, and by December 2012, Epps had ended the relationship, at which point Barlow moved back in with Epps. Despite the end of the romantic relationship, Garrett and Epps still occasionally saw each other. At one point, Barlow and Epps were with Garrett at his mother's home. When they discussed the fact that Epps had been dating other men, Garrett stated that "eventually [these men] would start disappearing and people would wonder what happened to them." Tr. pp. 46-47.

[4] Epps began dating the victim in this case, Carl Gildersleede ("Gildersleede")[1] in December 2012. In May 2013, Garrett had begun to date another woman, Brittany Beverly ("Beverly"), and lived with her. Although they were dating other people, Epps and Garrett still exchanged text messages.

[5] On May 31, 2013, Barlow celebrated her birthday with Epps, Gildersleede, and several other friends at a nightclub in Indianapolis. Garrett was not invited, as he and Barlow did not get along well. Epps exchanged text messages with Garrett earlier that day but stopped responding to Garrett's messages later in the evening. She decided against inviting Garrett because he and Gildersleede had not met, and she was concerned that her ex-boyfriend meeting her current boyfriend would be "awkward." Tr. p. 79.

[6] The group of friends celebrating Barlow's birthday arrived at the nightclub around midnight and stayed for approximately an hour. Barlow, Epps, and Gildersleede then drove Epps's vehicle to a bar, where they remained until the bar closed at 3:00 a.m. They then dropped Barlow off at her home, and Epps and Gildersleede drove to a nearby gas station convenience store to buy cigarettes. Gildersleede went into the store while Epps remained in the vehicle.

[7] At approximately 3:20 a.m., a call was made from the mobile phone shared by Epps and Gildersleede to Garrett's phone, but the call went unanswered. Over

---

[1] The trial transcript spells the victim's name as "Gildersleeve." On appeal, both parties note that, at the sentencing hearing, the victim's mother spelled her name for the record as "Gildersleede." Tr. p. 566. Both parties use the latter spelling, which we also use for purposes of this appeal.

the next ten minutes, four calls were made from Garrett's phone to Epps's phone. These calls were either answered or went to voicemail, but any voicemail messages left could not be retrieved, forensically. According to Garrett, he called Epps back when he saw that he had missed a call from her number. However, when he called, Gildersleede answered and questioned why Garrett was calling his girlfriend. Garrett claims that he initially hung up but then called back, and Gildersleede asked Garrett if he was having sex with Epps. Garrett claims that Gildersleede stated that he wanted to speak with Garrett and agreed to meet at the gas station. Epps denied hearing any of these telephone conversations between Garrett and Gildersleede.

[8] At the gas station, Garrett arrived in his girlfriend's vehicle with two other men and parked behind Epps's vehicle. Shortly thereafter, Gildersleede exited the convenience store and was confronted by Garrett. Epps heard the two men arguing. She saw the men pushing each other and getting into a "scuffle." Tr. p. 85. Epps then heard gunshots. Gildersleede ran across the parking lot a short distance, then collapsed. Garrett and his companions got back into their vehicle and drove away. Garrett later disposed of the gun that had been used in the shooting, and it was never recovered.

[9] Epps initially ran after Garrett, yelling. She then turned her attention to Gildersleede, who she found lying on the ground, bleeding heavily. Gildersleede had been shot twice in the left side of his chest. The bullets passed through Gildersleede's body, causing severe damage to his heart and lungs and

massive internal bleeding. Medical testimony at trial revealed that Gildersleede likely died within minutes of being shot.

[10] Indianapolis Metropolitan Police Department ("IMPD") Detective Greg Hagan ("Detective Hagan") arrived at the scene of the shooting and spoke with Epps, who was traumatized and upset. Detective Hagan took Epps to the police station to interview her. Epps initially denied knowing the identity of the man who had confronted Gildersleede in the parking lot of the gas station. However, later that day, during another interview, she admitted that the man was Garrett after being confronted with video surveillance recordings showing Garrett in the parking lot.

[11] Later on the morning of the shooting, but still before 5:00 a.m., Garrett's girlfriend Beverly called him because she needed to go to work and Garrett had used her truck the night before to go out after they had returned from a birthday dinner. She attempted to call Garrett twenty-six times, but he did not answer. He later appeared at her house, but when Beverly went to enter her vehicle, it was not in the driveway. She asked Garrett the location of her vehicle, and he claimed that it was in the driveway and that the keys were on the dresser. However, neither the keys nor the vehicle were there. Beverly therefore reported the truck as stolen.

[12] The police investigation of the shooting quickly led them to suspect Garrett, and they detained and interrogated him on June 2, 2013. At first, Garrett denied even having been at the gas station, despite the video surveillance footage. He claimed instead that he had been in bed at the time and had no idea

why Epps would state that he was involved in the shooting. After further questioning, however, Garrett stated that Gildersleede had called him and began "running his mouth," and asked to meet him at the gas station. Ex. Vol., State's Ex. 80, p. 23. Garrett recounted his version of events as follows:

> So I pulled over there. I had, I had one of my friends with me and he had his buddy with him, but I don't know his name. And I pushed him. I walked over there to the vehicle and I talked to her for a second and he came out. I was like, "Now what do you want to talk about?" He said, "Quit calling my girl." Pushed me in my face. So I swung at him when I hit him. He started reaching and he came out with a gun. So I struggled with him and the gun went off.

*Id*. Garrett claimed that he did not take the gun and that, as far as he knew, Gildersleede "still had it in his hand." *Id*. at 36.

[13]    On June 4, 2013, the State charged Garrett with murder. On October 2, 2014, the State filed a notice of its intent to introduce evidence under one of the exceptions listed in Indiana Evidence Rule 404(b). Specifically, the State intended to elicit testimony from Barlow regarding Garrett's statement that Epps's boyfriends would "disappear." The court held a hearing on the matter, and Garrett argued that the statements were too remote in time and therefore irrelevant and unduly prejudicial. The trial court ruled that the evidence was admissible but granted Garrett a "standing objection." Tr. pp. 10-11.

[14]    A jury trial was held on July 13 – 15, 2015. The State elicited testimony from Barlow regarding Garrett's prior statements that Epps's boyfriends would disappear. Garrett testified in his own defense and claimed that he called

Gildersleede to talk about the situation with Epps. Garrett testified that Gildersleede asked him to meet at the gas station. He also testified that, when he arrived at the station, he initially opened the door on Epps's vehicle and asked her why she had Gildersleede call him. According to Garrett, Gildersleede then began to accuse Epps of cheating on him with Garrett. The two men exchanged words, and according to Garrett, Gildersleede poked him in the face. Garrett claimed that Gildersleede reached into his waist band and began to pull out a handgun, at which point Garrett attempted to stop him. Garrett testified that, as they struggled over the gun, it discharged twice. For the first time, Garrett admitted that he took the gun and threw the gun out of the car as he drove away. He also claimed that he was not even sure if Gildersleede had been shot.

[15] At the conclusion of the evidence, the trial court instructed the jury, without objection, regarding murder, voluntary manslaughter, and self-defense. The jury found Garrett guilty as charged, and the trial court subsequently sentenced him to serve an executed term of sixty-one years. Garrett now appeals.

## I. Evidence Rule 404(b)

[16] Garrett first argues that the trial court erred in admitting Barlow's testimony regarding Garrett's prior statement regarding Epps's boyfriends "disappearing." Decisions regarding the admission of evidence are entrusted to the sound discretion of the trial court. *Rogers v. State*, 897 N.E.2d 955, 959 (Ind. Ct. App. 2008), *trans. denied*. Accordingly, we review a trial court's decision regarding the admission of evidence only for an abuse of that discretion. *Id*. A trial court

abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.*

[17] At issue here is Indiana Evidence Rule 404(b), which provides:

> (b) Crimes, Wrongs, or Other Acts.
>
> > (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
> >
> > > (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> > >
> > > (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

[18] Rule 404(b) is designed to prevent the jury from making the "forbidden inference" that prior wrongful conduct suggests present guilt. *Halliburton v. State*, 1 N.E.3d 670, 681 (Ind. 2013). In other words, the rule "prevents the State from punishing people for their character, and evidence of extrinsic

offenses poses the danger that the jury will convict the defendant because . . . he has a tendency to commit other crimes." *Bassett v. State*, 795 N.E.2d 1050, 1053 (Ind. 2003). When determining whether to admit evidence under Rule 404(b), the trial court must first determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and then balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Halliburton*, 1 N.E.3d at 682 (citing *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind. 2002)).

[19] Here, Garrett claims that his statement that Epps's boyfriends would start to disappear is prohibited by Evidence Rule 404(b). We disagree. First, we are not convinced that his statement is even the sort of "crime, wrong, or other act" referenced by Rule 404(b). Indeed, Garrett's statement was not a crime or wrong act; it was simply a statement.

[20] We find support for our conclusion in *Hicks v. State*, 690 N.E.2d 215 (Ind. 1997). In that case, the defendant was charged with the 1994 murder of his ex-girlfriend. On appeal, he claimed that the trial court had erred in admitting various statements he had made to witnesses that reflected his hostility toward the victim. Specifically, the trial court admitted testimony that, in the summer of 1992, Hicks stated on two occasions that he "wanted [the victim] dead"; testimony that three months before the murder, Hicks stated that he "wished [the victim] was dead"; and testimony that two days before the murder, Hicks had stated, "take me over there, take me over there, I just . . . I just want to shoot her." *Id*. at 221 n.11. The *Hicks* court held that these statements were "not

evidence of 'other crimes, wrongs, or acts' for 404(b) purposes." *Id*. Instead, Hicks simply made "a statement about his state of mind at the time. To state what one is feeling, as opposed to a direct threat to the victim, is not a 'bad act' as such." *Id*. We think the same is true here. Garrett made no direct threat to the Gildersleede. He simply made a statement that Epps's boyfriends would start "disappearing."

[21] Even if we did consider Garrett's statement to be the sort of crime, wrong, or act covered by Evidence Rule 404(b), it would still be admissible under the exceptions listed in that rule. As set forth in Rule 404(b), evidence that would be inadmissible to show a person's character may be admissible for another purpose, including proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Here, Garrett's statement was admissible to prove both his motive and intent.

[22] The intent exception under Evidence Rule 404(b) is available when a defendant goes beyond simply denying the charged culpability and affirmatively alleges a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation in the defendant's own case-in-chief. *Thompson v. State*, 15 N.E.3d 1097, 1102 (Ind. Ct. App. 2014). Here, Garrett went beyond simply denying that he knowingly or intentionally killed Gildersleede. His theory of defense was that he was acting in self-defense by trying to prevent Gildersleede from shooting him when the gun went off. Because he affirmatively alleged a contrary intent, the evidence regarding his prior statement was admissible to prove his intent. *See Shoultz v. State*, 995

N.E.2d 647, 655 (Ind. Ct. App. 2013) (holding that evidence of prior misconduct was admissible to show defendant's intent when he asserted claim of self-defense); *Sudberry v. State*, 982 N.E.2d 475, 480 (Ind. Ct. App. 2013) (holding that defendant placed his intent at issue during trial by raising the issue of self-defense).

[23] The prior statement was also admissible to prove Garrett's motive. *See Berry v. State*, 704 N.E.2d 462, 464 (Ind. 1998) (holding that defendant's threatening statement to victims made six months before murders was properly admitted into evidence); *Sudberry v. State*, 982 N.E.2d 475, 481 (Ind. Ct. App. 2013) (holding that defendant's threatening statement to victim made over one year before the battery was admissible).

[24] Nor can we say that the trial court abused its discretion in concluding that the danger of unfair prejudice did not outweigh the probative value of Garrett's statements. Again, the statements Garrett made were not the sort of prior criminal or otherwise improper act that would cause serious concern that the jury might punish Garrett for his character. Moreover, the statement was highly relevant to disprove Garrett's claims that he was acting in self-defense or sudden heat.

[25] In short, the trial court did not abuse its discretion in admitting into evidence Barlow's testimony recounting Garrett's statement that Epps's boyfriends would start to "disappear." This statement was not evidence of a crime, wrong, or act that would be inadmissible under Evidence Rule 404(b). Even if it did fall

within the ambit of the rule, Garrett's statement was not offered into evidence to prove his character; it was instead offered to prove his intent and motive, i.e. his jealousy of Epps's new boyfriend.

## II. Jury Instructions

Garrett next claims that the trial court erred in instructing the jury regarding the elements of murder, voluntary manslaughter, and self-defense. The manner of instructing a jury is left to the sound discretion of the trial court. *Rogers v. State*, 897 N.E.2d 955, 962 (Ind. Ct. App. 2008), *trans. denied*. We will not reverse the trial court's ruling unless the instructional error is such that the charge to the jury misstates the law or otherwise misleads the jury. *Id*. Jury instructions must be considered as a whole and in reference to each other, and even an erroneous instruction will not constitute reversible error if the instructions, taken as a whole, do not misstate the law or otherwise mislead the jury. *Id*.

Garrett acknowledges that he did not object to the instructions he now claims were improper. This failure to object generally results in waiver of the issue on appeal. *Munford v. State*, 923 N.E.2d 11, 13 (Ind. Ct. App. 2010). Garrett attempts to avoid waiver by claiming that the trial court's instruction constituted fundamental error. As this court explained in *Munford*:

> The fundamental error exception to the waiver rule is an extremely narrow one. To rise to the level of fundamental error, the error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. Specifically, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error

must deny the defendant fundamental due process. When we consider a claim of fundamental error with respect to jury instructions, we look to the jury instructions as a whole to determine if they were adequate.

*Id.* at 13-14 (citations omitted).

[28] Garrett's contentions regarding improper jury instructions revolve around Final Instruction 8, which provided:

The crime of Murder is defined by law as follows:

A person who knowingly or intentionally kills another human being, commits Murder, a felony.

Included in the charge in this case is the crime of Voluntary Manslaughter, which is defined by the law as follows: A person who knowingly or intentionally kills another human being while acting under Sudden Heat commits Voluntary Manslaughter, a class B felony. The offense is a class A felony if it is committed by means of a deadly weapon.

Sudden Heat is a mitigating factor that reduces what otherwise would be Murder to Voluntary Manslaughter. The State has the burden of proving beyond a reasonable doubt that the Defendant was not acting under Sudden Heat.

Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:

1. The Defendant, Philip Garrett

2. Knowingly

3. Killed another human being, namely: Carl Gildersleeve [sic], by shooting a deadly weapon, that is: a gun.

4. And the Defendant was not acting under Sudden Heat

5. And the Defendant killed by means of a deadly weapon.

*If the State failed to prove each of these elements 1 through 3 beyond a reasonable doubt, you must find the Defendant Not Guilty of Murder as charged in Count I.*

If the State did prove each of these elements 1 through 3 and element 5 beyond a reasonable doubt, but the State failed to prove beyond a reasonable doubt element 4, you may find the Defendant Guilty of Voluntary Manslaughter, a class A felony, a lesser included offense of Count I.

If the State did prove each of these elements 1 through 4 beyond a reasonable doubt, you may find the Defendant Guilty of Murder, a felony as charged in Count I.

Appellant's App. pp. 105-06 (emphasis added).

[29] Garrett claims that the above-emphasized portion of Final Instruction 8 was subject to an incorrect interpretation. Specifically, he argues that the language, "If the State failed to prove each of these elements 1 through 3 beyond a reasonable doubt, you must find the Defendant Not Guilty of Murder," creates a negative implication that the jury could find him guilty of murder if the State proved less than all three elements. Garrett contends that, to be correct, the instruction should have stated, "If the State failed to prove *any one* of these

elements 1 through 3 beyond a reasonable doubt, you must find the Defendant Not Guilty of Murder." Appellant's Br. p. 27.

[30]     We find this construction of the instruction to be, at best, strained. A plain reading of the instruction as a whole clearly instructed the jury that it was required to find that the State had proven *all* of the elements in order to convict Garrett and that the failure to prove these elements required them to acquit. The jury was also informed, in a separate instruction, that the State was required to "prove each element of the crime charged beyond a reasonable doubt." Appellant's App. p. 99. Accordingly, we reject Garrett's claim that Final Instruction 8 instructed the jury that it could find him guilty if the State proved less than all of the elements of murder.

[31]     Garrett further claims that Final Instruction 8 was improper because it permitted the jury to find him guilty of murder despite his claim of self-defense. This claim is meritless. As Garrett himself acknowledges, the trial court gave the jury a separate instruction regarding self-defense which clearly explained to the jury that the State was required to prove beyond a reasonable doubt that Garrett was not acting in self-defense. *See* Appellant's App. pp. 108-09 ("When a claim of Self-Defense is made, the State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense."). The fact that self-defense was not mentioned in Final Instruction 8 does not render it erroneous because the elements of self-defense were set forth in a separate instruction, and the jury was instructed to consider the instructions as a whole. *See* Appellant's App. p. 98.

[32] Accordingly, considering the instructions as a whole, we cannot say that the trial court committed any error, let alone fundamental error, in the manner in which it instructed the jury regarding the elements of murder, sudden heat, and self-defense.

### III. Prosecutorial Misconduct

[33] Lastly, Garrett argues that the prosecuting attorney committed misconduct during the State's closing argument. Where a claim of prosecutorial misconduct has been properly preserved for appeal, the reviewing court must determine both whether the prosecutor engaged in misconduct, and if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Shelby v. State*, 986 N.E.2d 345, 363 (Ind. Ct. App. 2013), *trans. denied*.

[34] To preserve a claim of prosecutorial misconduct, the defendant must both object and request an admonishment. *Id.* If the objecting party is not satisfied with the admonishment, the proper procedure is to move for a mistrial. *Id*. The failure to request an admonishment or move for a mistrial results in waiver of the issue on appeal. *Id*. Here, Garrett acknowledges that he neither objected to the statements he now claims were improper, nor did he request an admonishment. He therefore failed to preserve his argument for appeal.

[35] When a claim of prosecutorial misconduct has not been properly preserved, the defendant must establish not only the grounds for the misconduct, but also the additional grounds of fundamental error. *Id*. As we noted above, the

fundamental error exception to the waiver rule is an extremely narrow one. *Id.* at 363-64. To rise to the level of fundamental error, the error complained of must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Id.*

[36] Garrett's argument centers on the following statement made by the prosecuting attorney during the State's closing argument:

> The term sudden heat means a mental state which results from provocation sufficient to excite the Defendant of these emotions, sufficient to obscure the reason of an ordinary person — not some trigger happy guy who's jealous — and such prevents deliberation and premeditation.

> It excludes malice. You can't just be so angry that you want to hurt somebody. It renders a Defendant incapable of cool reflection.

> That's what we talked about in jury selection. That's what we talked about. That's why the classic law school example is a guy who walks in on his wife in bed with another man. There's a gun right there. He snaps and he pulls the trigger. And then he's like, Oh my God. What did I just do?

> You can understand that. An ordinary person can understand that. *An ordinary person does not talk to somebody on the phone, attempt to get ahold of them three times, track them down to a gas station, stand there and get in an argument, pull the trigger and then say, Oh, my God. That was sudden heat.*

> *That's not sudden heat. If that's not something that an ordinary person would do under those circumstances, that's not sudden heat. That is some*

*guy who is mad, malice in his heart for the guy that he thinks is taking away Laprecious from him. An ordinary person would not do what he did.*

*Sudden heat is not anger. Sudden heat is not being mad. You don't go — you don't get to go around killing your ex-girlfriend's old boyfriends because you're jealous and say it's sudden heat and it's not murder. That's not sudden heat. Being mad, being angry, being jealous is not sudden heat. It's not. So this is out the window.*

Tr. pp. 541-43 (emphasis added).

[37]  Garrett contends that the emphasized portion of this statement misled the jury regarding the meaning of "sudden heat." Specifically, Garrett argues that the prosecutor's statements indicated that the jury should evaluate the existence of sudden heat based on what an "ordinary person" would do, but that the law required the jury to consider the existence of sudden heat from the defendant's subjective state of mind.

[38]  First, we note that Garrett does not deny that the trial court properly instructed the jury with regard to the definition of sudden heat. We presume that the jury follows the trial court's instructions. *Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015), *reh'g denied*. For this reason alone, we conclude that Garrett has not established that the prosecuting attorney's statements constitute fundamental error.

[39]  Additionally, "sudden heat" has been defined as "anger, rage, resentment, or terror sufficient to obscure the reason of an *ordinary person*, preventing

deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Roberson v. State*, 982 N.E.2d 452, 456 (Ind. Ct. App. 2013) (emphasis added). Any alleged provocation "must be such that it would obscure the reason of an '*ordinary man*,' which is an *objective* as opposed to a subjective standard." *Id.* at 457. Moreover, it is well-settled that anger alone is insufficient to establish sudden heat. *Washington v. State*, 808 N.E.2d 617, 626 (Ind. 2004) (citing *Wilson v. State*, 697 N.E.2d 466, 474 (Ind. 1998)). Accordingly, we are unable to say that the prosecuting attorney's statements were so improper as to constitute fundamental error.

## Conclusion

[40] The trial court did not abuse its discretion when it permitted Barlow to testify that Garrett had previously made a statement that Epps's new boyfriends would start to disappear, nor did the trial court's instruction regarding murder, voluntary manslaughter, and self-defense constitute fundamental error. Similarly, the prosecuting attorney's statements regarding sudden heat during the State's closing arguments did not amount to fundamental error, and we affirm the judgment of the trial court.

[41] Affirmed.

Vaidik, C.J., and Barnes, J., concur.