## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 07 2018, 5:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

William Byer, Jr.
Byer & Byer
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark A. Emerson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 7, 2018 <br><br> Court of Appeals Case No. <br> 48A02-1706-CR-1430 <br><br> Appeal from the Madison Circuit Court <br><br> The Honorable Mark K. Dudley, Judge <br><br> Trial Court Cause No. <br> 48C06-1506-MR-962 |

**Mathias, Judge.**

[1]     Following a jury trial in Madison Circuit Court, Mark A. Emerson

("Emerson") was convicted of one count of murder, four counts of Level 3

felony kidnapping, and one count each of Level 5 felony intimidation, Level 5 felony battery by means of a deadly weapon, Level 6 felony auto theft, and Class A misdemeanor interfering with the reporting of a crime. Emerson appeals and presents two issues for our review, which we restate as: (1) whether the trial court abused its discretion in instructing the jury, and (2) whether the State presented evidence sufficient to support Emerson's convictions for kidnapping.

We affirm.

## Facts and Procedural History

In June 2015, Emerson and his then-wife Lara had separated but not yet divorced. The two had one child together, and Lara had two other children from a previous relationship. After the split, Lara and her children remained in the marital home in Anderson, while Emerson stayed with a friend in Indianapolis. At this time, Lara was in a romantic relationship with Cody Gay ("Gay"). Emerson was aware that Lara was dating Gay and that Lara had been in sexual relationships with other men.

On June 21, 2015, Emerson sent Lara a text message asking if he could come over to the house to see the children for Father's Day, a request she denied. Later that day, she had a friend, Willard Chilton ("Chilton"), drive her to a local auto dealership to pick up her vehicle, which had been in the shop. After picking up the vehicle, she stopped at a Walmart. But when she came back out of the store, she noticed that the left side tires of her vehicle were flat. Lara

called Chilton, who came to pick her up. Chilton told Lara that she could borrow his car after dropping him off at work. Lara then drove Chilton to work and went to Gay's apartment afterward. At Gay's apartment, her cell phone began to lock her out and repeatedly ask for a passcode. Although she did not know it at the time, Emerson later told Lara that he had access to her phone and had been locking her out. Lara drove Gay and her children back to her home. She put the children in the play room to watch a movie while she and Gay went to her bedroom in the basement to engage in sexual activity.

[5] Emerson knew that Lara and Gay were on their way to Lara's house, as he had access to her phone messages. Emerson bought an air pistol that looked like a real firearm so that he could frighten Gay. He had also stopped by Lara's home earlier in the day and placed a machete in the basement because he thought he "might have to have a weapon." Tr. Vol. 3, p. 74. He also placed a hatchet, which he already owned, inside the garage. He then waited behind the garage as Lara and Gay arrived.

[6] As Lara and Gay were engaged in sexual activities, they heard a loud bang come from upstairs as Emerson came down the stairs and into the bedroom, brandishing the air pistol and the machete. Emerson caught the couple engaged in sexual activity and told Lara that she "could have waited 'til we were at least divorced[.]" Tr. Vol. 1, p. 143. Gay backed up from the bed on which Lara was lying and held up his hands. Gay claimed that he thought Lara was divorced and stated, "If I was in your situation, I'd be mad." *Id*. Emerson with the pistol

still pointed at Gay's head, pulled the trigger several times, shooting Gay with BBs. Only then did Lara realize the pistol was an air pistol and not a firearm.

[7] Emerson dropped the gun and began to swing the machete at Gay, who defended himself by holding up his arms. Gay was injured but managed to take the machete away from Emerson. Emerson then began to attack Gay with the hatchet, which he brought with him from the garage. Gay was again able to disarm Emerson by taking the hatchet from him. Emerson then pulled out a knife from his pocket. Gay asked Emerson if he could wash the blood off his hand, which had sustained a substantial cut as a result of grabbing the machete. Emerson agreed and told Gay to go over to a nearby sink.

[8] As the two men talked by the sink, Lara asked them to give the weapons to her, but they declined. As Gay washed the blood off his hands, Lara grabbed her phone to call 911, but Emerson snatched the phone from her hands. Gay then "jumped right on top of [Emerson]." *Id.* at 151. Although Gay was armed with the machete and hatchet, he did not strike Emerson with these weapons. Emerson stabbed Gay in the chest with the knife. Lara ran up the stairs, and heard Gay shout, "Oh my God, Lara, call the cops!" *Id.* at 151–52. Lara ran outside to seek assistance but saw no one. Emerson then followed her outside, covered in blood, and told her that Gay was bleeding profusely. Emerson asked Lara, who had first aid training in the Army National Guard, to help him.

[9] When Lara went back downstairs, she saw Gay at the bottom of the stairs lying in a pool of blood. Gay's knife wound was still bleeding profusely, and Lara

attempted to stop the bleeding by pressing a towel on the wound. Lara told Emerson that they needed to telephone the police, and Emerson initially agreed, saying, "Yeah, we'll call the cops." *Id*. at 156. He then went upstairs for a few minutes as Lara tended to the dying Gay. Lara saw Gay's phone and picked it up to call for help, but the phone was locked. Emerson returned downstairs, saw Lara with the phone, took it from her, and threw it across the bed. Emerson then spoke of cleaning up and leaving the scene, saying, "We're gonna clean up. We're gonna get outta here." *Id*. Lara initially objected. She soon realized, however, that Emerson would not let her leave him, so she agreed to his plan, and the two attempted to clean the blood off their hands.

[10] After cleaning up, Emerson and Lara went upstairs. Emerson still had the knife in his pocket, and Lara attempted to grab the knife from him. When she did, Emerson grabbed her by the hair and made her go back downstairs. Emerson then began to talk about leaving and suggested that they dispose of Gay's body. Lara objected to this plan, so Emerson instead covered Gay's body with a blanket. Lara was scared of Emerson, so when he told her to prepare to leave the house, she got the children and prepared to leave. Lara's thought at that time was, "if we got in the front yard with the kids, I could try again and scream for help. And at the same time, I was also scared. I was just gonna do everything he told me to do." *Id*. at 161.

[11] Lara testified that, once they got in the front yard:

> I started screaming, just looking around screaming for someone
> to come out here and call the cops. And then [Emerson] looked

at me with this extreme look of panic on his face and said that we needed to just get in the car. And he told me that he would let me drive to the police station.

*Id*. at 162.

[12] Once the children were in the car, Lara got into the driver's seat and began to drive. When she asked Emerson if she could go to the police station like he said, Emerson responded, "No." *Id*. at 189. Instead, Emerson stated that he wanted to drive to Canada. Because Emerson still had the knife in his hands at his side, Lara complied.

[13] Lara drove until she had to stop to refuel the car. When she did, Emerson took the car keys with him into the gas station to pay. Lara did not attempt to flee because she was afraid that Emerson would kill her if she did. As they continued northward, Emerson tore the OneStar system out of the vehicle so that they could not be tracked. That night, they pulled the car into a field in the country to sleep. Emerson stayed awake until Lara fell asleep before he slept. The next morning Emerson got out of the car. Seeing a chance to escape, Lara jumped into the driver's seat and tried to drive away. Emerson, however, was able to quickly get back into the car before Lara could get away. Emerson threatened Lara with the knife and warned her "not to pull anything like that ever[] again." *Id*. at 196.

[14] As they continued to drive north, Emerson told Lara that, once they got to Canada, he would let her and the children go. In Minnesota, the car began to run low on fuel again, but neither Emerson nor Lara had enough money to buy

gasoline. Lara suggested that they stop at a Walmart, steal something inside, then return it for a gift card they could use to purchase gasoline. Emerson agreed, but took the children with him inside, apparently believing that Lara would not run away if he had the children. Lara, however, had already planned to try to find help once Emerson went inside the store.

Once Emerson was inside, Lara ran away from the car and went to a nearby car dealership and asked them if she could use their telephone to call 911. The dealership employees allowed Lara to call 911, and Lara told the dispatcher that, "I think he killed him, and he kidnapped me and my kids and took us all the way here, and he's trying to make it to Canada. And he took my kids into Walmart[,] and this is the first time I got to get away[.]" *Id.* at 207. Police from Hermantown, Minnesota arrived on the scene and arrested Emerson as he exited the store.

The Minnesota police advised Emerson of his *Miranda* rights and questioned him. Emerson proceeded to give them his version of events. Emerson told the police that he knew he was not supposed to be at Lara's house.[1] Emerson admitted that he knew Gay was there and bought the air pistol to scare him. He also admitted that he placed the machete in the basement earlier so he could have access to a weapon when he confronted Gay. Emerson also told the police that when he confronted Gay, he did not believe Gay's protestations that he

---

[1] In fact, both Lara and Emerson were under the mistaken belief that there was a protective order issued against Emerson.

was unaware that Emerson and Lara were still married, as he had had previous conversations with Gay in which he referred to Lara as Emerson's wife. Emerson claimed that Gay was first injured trying to take the machete away from him and that he then grabbed the hatchet. Emerson claimed that, after cleaning his hand, Gay lunged at him and took the hatchet away from him and that he stabbed Gay only when Gay raised the hatchet into the air to attack him. Emerson claimed that he did not call the police because his phone was dead, Gay's phone was locked, and Lara's phone was not available. Emerson also told the police that Lara had told him to run so he would not have to go to prison. However, Emerson further admitted that Lara was afraid of him and that the car they took was not Lara's or Gay's but belonged to Lara's friend.

[17] The State subsequently charged Emerson as follows: Count I, Level 5 felony intimidation; Count II, Level 5 felony battery by means of a deadly weapon; Count III, Class A misdemeanor interfering with the reporting of a crime; Count IV, murder; Counts V–VIII, Level 3 felony kidnapping; and Count IX, Level 6 felony auto theft.

[18] A jury trial was held on April 25–28 and May 1–4, 2017. At the conclusion of the presentation of evidence, Emerson tendered jury instructions on the defense of mistake of fact, voluntary manslaughter, and involuntary manslaughter. The trial court rejected these instructions as unsupported by the evidence. Emerson also tendered an instruction on self-defense, but the trial court instead chose to give to the jury its own self-defense instruction, which was based on the pattern jury instruction on self-defense. At the conclusion of the trial, the jury found

Emerson guilty as charged. On June 1, 2017, the trial court sentenced Emerson to an aggregate term of eighty-six years and nine months of incarceration.[2] Emerson now appeals.

# Discussion and Decision

On appeal, Emerson argues that the trial court abused its discretion when it declined to give his tendered jury instructions and also argues that the evidence is insufficient to support his convictions for kidnapping.

## I. Jury Instructions

It is well settled that instructing the jury lies within the trial court's sound discretion, and we review the trial court's decisions with regard to jury instructions only for an abuse of that discretion. *Shelby v. State*, 986 N.E.2d 345, 360 (Ind. Ct. App. 2013), *trans. denied*. In determining whether the trial court abused its discretion in refusing to give a tendered instruction we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record supporting the instruction; and (3) whether the substance of the instruction is covered by other instructions. *Id*. To constitute an abuse of discretion, an instruction that is given to the jury must be erroneous, and the

[2] Specifically, the trial court imposed the following sentences: Count I, four and one-half years; Count II, four and one-half years; Count III, eleven months; Count IV, sixty years; Counts V–VIII, twelve and one-half years each; and Count IX, twenty-one months. The sentences on Counts I, II, and IV were ordered to run concurrently for a total of sixty years; the sentences on Counts III and V were ordered to be served concurrently with each other, but consecutive to the sentences on Counts I, II, and IV, for an additional twelve and one-half years; the sentences on Counts VI, VII, and VIII were ordered to run for a concurrent twelve and one-half years, but consecutive to the sentences on Counts I, II, and IV and on Counts III and V; and the sentence on Count XI was ordered to be served consecutively to all other counts, for an aggregate sentence of eighty-six years and nine months.

instructions viewed as a whole must misstate the law or otherwise mislead the jury. *Id.* When a defendant seeks reversal based on instructional error, he must demonstrate a reasonable probability that his substantial rights have been adversely affected. *Id.*

[21] Here, Emerson claims that the trial court abused its discretion by refusing three of his tendered instructions covering the subjects of mistake of fact, self-defense, voluntary manslaughter, and involuntary manslaughter. We address each of these tendered instructions in turn.

*A. Mistake of Fact*

[22] Emerson first claims that, with regard to the auto theft charge, the trial court should have instructed the jury on the defense of mistake of fact. Pursuant to Indiana Code section 35-41-3-7, "[i]t is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for commission of the offense." Once the State has made a *prima facie* case of guilt, "the burden is on the defendant to establish an evidentiary predicate of his mistaken belief of fact, which is such that it could create a reasonable doubt in the fact-finder's mind that the defendant had acted with the requisite mental state." *Saunders v. State*, 848 N.E.2d 1117, 1121 (Ind. Ct. App. 2006) (citing *Hoskins v. State*, 563 N.E.2d 571, 575 (Ind. 1990)), *trans. denied*. "Upon invoking mistake of fact as a defense, the burden shifts to the defendant to satisfy three elements: '(1) that the mistake be honest and reasonable; (2) that the mistake be about a matter of fact; and (3)

that the mistake negate the culpability required to commit the crime.'" *Chavers v. State*, 991 N.E.2d 148, 151 (Ind. Ct. App. 2013) (quoting *Potter v. State*, 684 N.E.2d 1127, 1135 (Ind. 1997)), *trans. denied*.

[23] Still, the State retains the ultimate burden of proving beyond a reasonable doubt every element of the charged crime, including culpability or intent, which would in turn entail proof that there was no reasonably held mistaken belief of fact. *Saunders*, 848 N.E.2d at 1121 (citing *Hoskins*, 563 N.E.2d at 575–76). And the State may meet its burden by directly rebutting evidence, by affirmatively showing that the defendant made no such mistake, or by simply relying upon evidence from its case-in-chief. *Id.* (citing *Bergmann v. State*, 486 N.E.2d 653, 660 (Ind. Ct. App. 1985)).

[24] To convict Emerson of auto theft, the State was required to prove that he knowingly or intentionally exerted unauthorized control over Chilton's motor vehicle with the intent to deprive Chilton of the vehicle's value or use. *See* Ind. Code § 35-43-4-2.5(b)(1) (2014)[3]; Appellant's App. p. 22. Emerson argues that there was no evidence indicating that Lara did not have authority to use Chilton's auto without restriction. Thus, he argues that he was mistaken with regard to the scope of Lara's permission to use the car, thereby vitiating any possible intent he may have had to use the vehicle without authorization. The State makes no argument that Emerson's tendered mistake-of-fact instruction

---

[3] This statute was repealed effective July 1, 2018. *See* P.L. 176-2018, § 7. The theft of a motor vehicle is now encompassed in the general theft statute. *See* Ind. Code § 35-43-4-2 (2018).

contained an incorrect statement of law.[4] It instead argues that there was no evidence in the record to support giving the instruction. We agree with the State.

[25] Lara testified that she had Chilton's permission to drive his car to and from work the following day, and Chilton testified that Lara was supposed to return his car the following day and that he did not give Lara or Emerson permission to drive his car to Minnesota. Thus, contrary to Emerson's claims, there was ample evidence adduced at trial that he did not have permission to drive Chilton's vehicle and that Lara's permission to use the car was limited to driving to and from work for one day. Emerson testified that although he did not personally know who owned the car, he knew it was not his. His testimony also indicates that he knew it did not belong to Lara, as he claimed that Lara told him she could use the car "as long as she needed while her car was done." Tr. Vol. VI, p. 218. Emerson argues that this testimony raised the mistake-of-fact defense regarding his knowledge of the scope of Lara's permission to use

---

[4] Emerson's tendered instruction provided:

> The defense of mistake of fact is defined as follows:
> It is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for the commission of the offense.
> The reasonable mistake about a fact must have prevented the defendant from[:]
> forming the intent to commit the offense of which he is charged, or
> knowing that the offense charged was being committed, or
> being reckless in his conduct.
> The State has the burden of disproving this defense beyond a reasonable doubt.

Appellant's App. p. 70.

the car. But the question before the jury was not the extent of *Lara's* permission to use Chilton's car. The question was whether *Emerson* exerted unauthorized control over Chilton's vehicle with the intent to deprive Chilton of the vehicle's value or use. Although Emerson claims the he did not drive the car, he forced Lara to do so at knifepoint. Suffice it to say that there was no evidence that Emerson was honestly and reasonably mistaken that he had permission to use the car to force Lara to drive him away from a murder scene and flee to Canada.

Thus, there was no evidence that would support giving a mistake-of-fact instruction regarding Emerson's claim that he believed that either he or Lara had unrestricted use of the vehicle. Accordingly, the trial court did not abuse its discretion by refusing Emerson's tendered instruction on the defense of mistake of fact.

## B. Self-Defense Instruction

Emerson also claims that the trial court abused its discretion by failing to give the jury his tendered instruction on self-defense, which provided in relevant part:

> The defense of self-defense is defined by law as follows:
>
> a.  A person is justified in using reasonable force against another person to protect himself or a third person from what he reasonably believes to be the imminent use of unlawful force.
>
> However, a person is justified in using deadly force only if he reasonably believes that that force is necessary to prevent serious

bodily injury to himself or a third person or the commission of a felony.

No person in this State shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary.

b. A person is justified in using reasonable force, including deadly force, against another person if he reasonably believes that the force is necessary to prevent or terminate the other person's entry of or attack on his dwelling or curtilage.

c. With respect to property other than a dwelling or curtilage, a person is justified in using reasonable force against another person if he reasonably believes that the force is necessary to immediately prevent or terminate the other person's trespass on or criminal interference with property lawfully in his possession, lawfully in possession of a member of his immediate family, or belonging to a person whose property he has authority to protect. However, a person is not justified in using deadly force unless the force is justified under subsection (a) of this section.

d. Notwithstanding subsections (a), (b), and (c) of this section, a person is not justified in using force if:

1. he is committing, or is escaping after the commission, of a crime;

2. he provokes unlawful action by another person with intent to cause bodily injury to the other person; or

3. he has entered into combat with another person or is the initial aggressor, unless he withdraws from the encounter and communicates to the other person his intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

The State has the burden of disproving this defense beyond a reasonable doubt.

Appellant's App. p. 72.

[28] The trial court instead gave the following self-defense instruction:

USE OF FORCE TO PROTECT A PERSON

A person may use reasonable force against another person to protect himself from what he reasonably believes to be the imminent use of unlawful force.

A person is justified in using deadly force, and does not have a duty to retreat, **only** if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself.

However a person may not use force if:

• He is committing a crime that is directly and immediately connected to the confrontation, or

• He provokes a fight with another person with intent to cause bodily injury to that person, or

• He has willingly entered into a fight with another person or started the fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw and the other person nevertheless continues or threatens to continue the fight.

The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense.

*Id.* at 64–65 (emphasis added).

[29] Emerson's only complaint about the trial court's instruction is that it includes the word "only" when describing when a person is justified in using deadly force. That is, the trial court's instruction informed the jury that "[a] person is

justified in using deadly force, and does not have a duty to retreat, **only** if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself." *Id*. (emphasis added). The word "only" does not appear in the text of the self-defense statute itself.[5] Thus, Emerson contends that the trial court's instruction was an incorrect statement of the law.

[30] The addition of the word "only," however, does not materially alter the meaning of the instruction. Informing the jury that a person is justified in using deadly force if he reasonably believes that such force is necessary to prevent serious bodily injury is not meaningfully different from informing the jury that a person is justified in using deadly force *only* if he reasonably believes that such force is necessary to prevent serious bodily injury. Both convey the same essential meaning that the defendant be required to have a reasonable belief that deadly force is necessary to prevent serious bodily injury before he may resort to the use of deadly force.

---

[5] Prior to 2006, the self-defense statute provided in relevant part "a person is justified in using deadly force **only** if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." I.C. § 35-41-3-2(a) (2002) (emphasis added). Effective July 1, 2006, the statute was amended to provide in relevant part, "a person: (1) is justified in using deadly force; and (2) does not have a duty to retreat; if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." I.C. § 35-41-3-2(a) (2006). Thus, the word "only" was removed from the statute in 2006, but as explained *infra*, this did not materially change the meaning of the statute.

The statute was amended again in 2012, moving the language at issue from subsection (a) to (c). It was amended yet again the following year, but the changes did not affect subsection (c).

[31]     We further note that the language of the trial court's self-defense instruction was taken from the Indiana Pattern Jury Instructions.[6] *Compare* Appellant's App. pp. 64–65 *with* Indiana Pattern Jury Instruction 10.0300. "The Indiana Pattern Jury Instructions are prepared under the auspices of the Indiana Judges Association in conjunction with the Indiana Judicial Conference Criminal and Civil Instruction Committees. Although they are not formally approved for use, they are tacitly recognized by Indiana Trial Rule 51(E)." *Campbell v. State*, 19 N.E.3d 271, 275 n.3 (Ind. 2014). Thus, although the Pattern Jury Instructions have not been formally approved by our supreme court, and certain pattern

---

[6] The pattern jury instruction on self-defense provides:

It is an issue whether the Defendant acted in [self-defense] [defense of another person].

A person may use reasonable force against another person to protect (himself/herself from what he/she) or (someone else) from what the Defendant reasonably believes to be the imminent use of unlawful force.

A person is justified in using deadly force, and does not have a duty to retreat, only if he/she reasonably believes that deadly force is necessary [to prevent serious bodily injury to himself/herself or a third person] [to prevent the commission of a forcible felony].

[However, a person may not use force if:

(he/she is committing a crime that is directly and immediately connected to the (confrontation) (use a descriptive term based on evidence). (or)

(he/she is escaping after the commission of a crime that is directly and immediately connected to the (confrontation) (use a descriptive term based on evidence).)

(or)

(he/she provokes a fight with another person with intent to cause bodily injury to that person).

(or)

(he/she has willingly entered into a fight with another person or started the fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw and the other person nevertheless continues or threatens to continue the fight).]

The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense.

Indiana Pattern Jury Instruction 10.0300. The trial court's self-defense instruction merely eliminated the introductory sentence from this pattern instruction.

instructions have even been held to not be a correct statement of the law, pattern jury instructions are given "preferential treatment" during litigation, and the preferred practice is to use the pattern instructions. *Harrison v. State*, 32 N.E.3d 240, 252 n.5 (Ind. Ct. App. 2015), *trans. denied*.

[32] The trial court here followed the preferred practice to use the pattern instruction on self-defense, and the trial court's instruction was not an incorrect statement of the law. Accordingly, the trial court did not abuse its discretion in instructing the jury regarding self-defense.

### C. Voluntary Manslaughter

[33] Emerson next contends that the trial court erred by failing to instruct the jury regarding the lesser-included offense of voluntary manslaughter. As set forth in *Wright v. State*, 658 N.E.2d 563, 566–67 (Ind. 1995), a trial court should instruct the jury regarding a lesser-included offense if the lesser offense is either inherently or factually included in the greater offense and there is a serious evidentiary dispute about an element that distinguishes the two offenses.

[34] A person who knowingly or intentionally kills another human being commits murder. Ind. Code § 35-42-1-1(1). But a person who knowingly or intentionally kills another human being while acting under "sudden heat" commits voluntary manslaughter. Ind. Code § 35-42-1-3(a). "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v.*

*State*, 829 N.E.2d 21, 24 (Ind. 2005). "Sudden heat excludes malice, and neither mere words nor anger, without more, provide sufficient provocation." *Id*. Since voluntary manslaughter is simply murder mitigated by evidence of sudden heat, it is an inherently included offense of murder. *Wilkins v. State*, 716 N.E.2d 955, 956–57 (Ind. 1999); *see also Watts v. State*, 885 N.E.2d 1228, 1232 (Ind. 2008) ("[V]oluntary manslaughter is a lesser-included offense of murder[.]").

[35] The only question before the trial court was therefore whether there was a serious evidentiary dispute regarding the existence of sudden heat. And here, the trial court made an explicit finding that there was an absence of any evidence of sudden heat. Tr. Vol. 7, pp. 27–29. Thus, we review the trial court's decision on this matter only for an abuse of discretion. *Washington v. State*, 808 N.E.2d 617, 626 (Ind. 2004).

[36] Emerson argues that there was a serious evidentiary dispute as to the existence of sudden heat because the evidence showed that he walked in on his estranged wife and her lover engaged in sexual activity. We have stated before that "discovery of alleged infidelity can 'introduce the element of sudden heat.'" *Suprenant v. State,* 925 N.E.2d 1280, 1283 (Ind. Ct. App. 2010) (quoting *Evans v. State*, 727 N.E.2d 1072, 1077 (Ind. 2000)), *trans. denied*. Thus, if Emerson had simply walked in unawares and caught Lara with Gay, the evidence might have supported a jury instruction on voluntary manslaughter. But this is not what happened.

[37] Instead, Emerson was already well aware that Lara was dating Gay and admitted that he knew she had been in sexual relationships with other men. Emerson stored weapons in the home and even bought an air pistol in his plan to scare Gay. We agree with the State that this demonstrates a degree of planning and forethought that belies a claim of sudden heat. Moreover, Emerson himself testified that he was "[n]ot really mad" about Lara and Gay's sexual activity because he had known about it "for a while." Tr. Vol. 6, p. 198. Under these facts and circumstances, the trial court did not abuse its discretion in finding that there was no serious evidentiary dispute regarding the existence of sudden heat. Therefore, the trial court did not abuse its discretion in declining to instruct the jury with regard to the lesser-included offense of voluntary manslaughter.

### D. Involuntary Manslaughter

[38] Emerson's final claim of evidentiary error is that the trial court abused its discretion by declining his tendered instruction on the lesser-included offense of involuntary manslaughter. Involuntary manslaughter is committed when a person kills another human being while committing or attempting to commit (1) a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury, (2) a Class A misdemeanor that inherently poses a risk of serious bodily injury, or (3) battery. Ind. Code § 35-42-1-4(b). In contrast to voluntary manslaughter, involuntary manslaughter is not an inherently included lesser offense of murder. *Evans*, 727 N.E.2d at 1081. However, involuntary manslaughter may be a factually included lesser offense of murder if the

charging information alleges that the killing was accomplished by means that would be a battery. *Id.* Where, however, the charging information merely alleges that the defendant killed the victim, without specifically alleging that the killing was accomplished by means that would be a battery, involuntary manslaughter is not a factually included offense. *See Champlain v. State*, 681 N.E.2d 696, 702 (Ind. 1997) (holding that involuntary manslaughter was not a factually included lesser offense of the charged crime of murder because the charging information did not assert a battery but merely alleged that the defendant knowingly killed the victim).

[39] Here, the charging information alleged simply that "Mark Alyn Emerson knowingly or intentionally killed Cody Gay." Appellant's App. p. 51. This does not allege a battery, nor does it allege a Class A misdemeanor, Level 6 felony, or Level 5 felony that inherently poses a risk of serious bodily injury. Accordingly, involuntary manslaughter was not a factually included offense of the charged crime of murder, and the trial court properly declined to instruct the jury on involuntary manslaughter.

[40] Emerson appears to argue that involuntary manslaughter was factually included in the charged crime of murder because the State also charged him with Level 5 felony battery by means of a deadly weapon. *See* Appellant's Brief at 33 (arguing that "involuntary manslaughter is a lesser included offense of the charged battery and murder."). However, the charged battery alleged that Emerson battered Gay with a "BB gun or a machete or a hatchet." Appellant's App. p. 50. Notably, none of these are the weapon that inflicted the fatal wound

to Gay, which was instead a knife. Thus, the State charged Gay with a separate and distinct act of battery—the initial attack on Gay with the air pistol, machete, and hatchet—in addition to the subsequent stabbing with the knife. The State did not allege that the killing was accomplished by means that would constitute a battery. Therefore, despite the additional charge of battery, the information charging Emerson with murder did not factually include the lesser-included offense of involuntary manslaughter, and the trial court did not abuse its discretion in rejecting Emerson's tendered instruction on involuntary manslaughter.

## II. Sufficiency of the Evidence

[41] Emerson also contends that the State failed to present evidence sufficient to support his convictions for kidnapping. When reviewing a claim that the evidence is insufficient to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses. *Harrison*, 32 N.E.3d at 247. We instead respect the exclusive province of the jury to weigh any conflicting evidence. *Id*. We consider only the probative evidence supporting the verdict and any reasonable inferences which may be drawn from this evidence, and we will affirm if the probative evidence and reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id*.

[42] To convict Emerson of kidnapping, the State was required to prove that he knowingly or intentionally removed Lara and the three children by fraud, enticement, force, or threat of force from one place to another, and committed

that offense while armed with a deadly weapon, i.e., a knife. *See* Ind. Code §§ 35-42-3-2(a), (b)(2)(A); Appellant's App. pp. 52–53. Emerson argues that there was no evidence that he removed any individual by a threat of force or that he was armed with a deadly weapon. We disagree.

[43] Emerson claims that Lara was not forced against her will to travel with him and that she participated in his plan to escape. But the evidence favorable to the jury's verdict shows that Emerson was armed with a knife—the very knife he had just used to fatally stab Lara's boyfriend—and that he initially told Lara that they would drive to the police station. When Lara asked if she could drive to the police station, Emerson told her no and instead that he wanted to drive to Canada. Lara complied because Emerson was still armed with a knife.

[44] The evidence also reveals that Emerson was well aware that Lara was not a willing participant in his plans to escape. When they stopped for fuel, Emerson took the keys with him when he went to pay for the gasoline. After they slept in the car in a field, Lara attempted to drive off without Emerson after he exited the car. When he managed to jump in the car before Lara could leave, he threatened her with the knife and warned her "not to pull anything like that ever[] again." Tr. Vol. 1, p. 196. Emerson was also well aware that Lara's three children were in the car when he threatened Lara and asked her to drive toward Canada.

[45] From this evidence, and the reasonable inferences that can be drawn from this evidence, the jury could reasonably conclude that Emerson knowingly removed

Lara and her children by the threat of force from one place to another and did so while armed with a knife, which is a deadly weapon.

[46] Emerson's citation to *Clayton v. State*, 658 N.E.2d 82 (Ind. Ct. App. 1995), is unavailing. In that case, the armed defendant approached the victim outside her home while she was unloading her car, which still contained two sleeping children: her son and her niece. *Id*. at 83. The defendant pointed his gun at the victim and demanded her money and purse. *Id*. The victim told the defendant that her purse was in the house, grabbed her niece, and went into her house with the defendant to find her purse. *Id*. Unable to find any money in the victim's purse, the defendant ordered the victim to go back outside and place the keys into the ignition. *Id*. He then ordered her to get the other child out of the car. *Id*. at 83–84. The victim did so, grabbed her son, and ran back into her house as the defendant drove her car away. *Id*. at 84. The defendant was subsequently convicted of kidnapping, burglary, robbery, and criminal confinement. *Id*.

[47] On appeal, the defendant argued *inter alia* that the evidence was insufficient to support his conviction for kidnapping. A panel of this court agreed, noting that there was no evidence that the defendant used force to keep either of the children in the car. *Id*. at 88. Instead, the victim voluntarily took one of the children into her house when she went to look for her purse. *Id*. And the defendant told the victim to remove the other child from the car before driving away. *Id*. Because the defendant permitted the victim to remove one child and ordered the victim to remove the other before her took the car, we held that there was insufficient evidence to support the kidnapping conviction. *Id*.

[48] The facts of *Clayton* stand in stark contrast to the facts present in the case before us. As noted above, Emerson was aware that Lara and her children were in the car when he forced her at knifepoint to drive north and not stop at the police station as he had earlier told her. He kept the keys with him when he left the car, and he threatened Lara when she attempted to drive away without him. Accordingly, we do not find *Clayton* to be controlling, and we conclude that the State presented sufficient evidence to support Emerson's convictions for kidnapping.

## Conclusion

[49] The trial court did not abuse its discretion in instructing the jury because: there was no evidence that would support a mistake-of-fact instruction regarding Emerson's claim that he mistakenly believed that Lara had unrestricted use of the vehicle; the trial court's self-defense instruction, which was based on the pattern jury instruction, was a correct statement of the law; there was no evidence supporting a finding of sudden heat and an instruction on voluntary manslaughter was therefore properly rejected; and the State did not allege the murder was accomplished by means of a battery, and involuntary manslaughter was therefore not a factually included offense. Lastly, the State presented evidence sufficient to support Emerson's convictions for kidnapping.

[50] Affirmed.

Riley, J., and May, J., concur.