## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 19 2019, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David E. Mosley
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Noah W. Nevil, Sr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 19, 2019

Court of Appeals Case No.
18A-CR-1497

Appeal from the Floyd Circuit Court

The Honorable J. Terrence Cody, Judge

Trial Court Cause No.
22C01-1506-MR-1071

**Mathias, Judge.**

[1] Following a jury trial in Floyd Circuit Court, Noah Nevil ("Nevil") was convicted of murder and sentenced to sixty-five years of incarceration. Nevil

appeals and presents two issues for our review, which we restate as: (1) whether the trial court abused its discretion by denying Nevil's motion to suppress his confession to the police, and (2) whether the State presented evidence sufficient to support his conviction.

We affirm.

## Facts and Procedural History

In the early morning hours of February 7, 2015, someone telephoned 911 and reported that a house on Park Avenue in New Albany, Indiana, was on fire. The first public safety officer to arrive at the scene of the fire, New Albany Police Department ("NAPD") Officer Andrew Byrne ("Officer Byrne"), went inside the burning home and found the victim in this case, Earl Moore ("Moore"), lying on the floor in a back room. Officer Byrne sought the help of firefighters, and they pulled Moore from the home. Moore was taken to the hospital, where he was pronounced dead.

Firefighters informed the police that the fire appeared to have been intentional, so the police started a death investigation. As the police secured the scene of the fire, Nevil approached NAPD Officer Derek Traughber, and pointed out a wallet lying on the ground in a tire rut. The wallet was lying below street level and was not visible without the aid of the officer's flashlight. Nevil informed another NAPD officer, Shawn Kesling ("Officer Kesling") that a friend told him that there had been a fire, so he stopped by to see what was happening. Nevil also told Officer Kesling that Moore was a personal friend and that he

had heard that two other individuals had been beating and robbing people in the area. Shortly thereafter, Nevil spoke with another NAPD officer Eric May and told him that he heard about the fire by listening to a police scanner application on his phone.

[5] NAPD Detective Steven Harris ("Detective Harris") interviewed Nevil later that same day. During the interview, Nevil attempted to minimize his familiarity with Moore, at one point even asking who Moore was. Nevil eventually admitted that he was friends with Moore and again claimed to have heard of the fire through a scanner app on his phone. Nevil claimed that, on the night of the fire, he had been with his fiancée and later went to an establishment near the Ohio River. There, he claimed to have heard about the fire on his phone. Nevil told Detective Harris, however, that his phone was now inoperable because he had dropped it in the toilet. Nevil eventually told Detective Harris that Moore was a close friend and a disabled veteran who had a prescription for methadone. Nevil also told the police that Moore sold his methadone to supplement his income.

[6] Forensic examination of Moore's body indicated that Moore had not died of smoke inhalation. Instead, he had suffered blunt force trauma to his head and manual or ligature strangulation. His face, ear, and throat had also been cut, but these wounds were superficial and did not cause his death. Moore also had soot in his trachea, indicating he was still alive when the fire began. The cause of death was determined to be blunt force trauma to the head and strangulation. Examination of the scene of the fire revealed that it had been intentionally set.

The fire started in the corner of an upholstered chair where Moore typically sat. Moore's dog was also found locked in the bathroom, which was atypical. The dog died as a result of the fire. Moore also had a video camera security system installed in his house, but the digital video recorder ("DVR") portion of the system was missing. However, video surveillance from other sources contradicted Nevil's claims about where he had been on the night of the fire. Indeed, video surveillance indicated that Nevil's vehicle was near Moore's house almost immediately after the fire was set.

[7] On June 14, 2015, Nevil was arrested on an out-of-state warrant from Kentucky that appeared in the National Crime Information Center ("NCIC") database. The following day, Nevil appeared in court and waived extradition. On June 16, 2015, NAPD Detectives Steve Bush ("Detective Bush") and Carrie East ("Detective East") interviewed Nevil again. Detective Bush had known Nevil for years and had a good rapport with him. During the interview, the police confronted Nevil with the inconsistencies in his statements. Eventually, Nevil admitted that he had gone to Moore's house to buy methadone and got into an argument with Moore. He claimed Moore hit him with a telephone and that, when he tried to leave, Moore followed him to the door. Nevil claimed that Moore reached for an umbrella that had a knife built into it, and the two struggled over the weapon, cutting Moore. When Nevil pushed Moore, he fell and hit his head on a coffee table. Nevil then admitted to strangling Moore and hitting him in the head with a heavy ashtray. Nevil further admitted that he took methadone pills and removed the DVR recorder from the security system.

He also admitted that he lit a blanket on fire and threw it on Moore's chair in an attempt to destroy the scene of the crime. He stated that he then threw most of his clothes and the DVR into the Ohio River, but he accidentally dropped Moore's wallet outside Moore's home where it was later found.

[8] Subsequent testing of blood stains found on the shirt Nevil had been wearing on the night of the fire revealed a mixture of DNA matching that of Moore and Nevil. Although not as conclusive as many DNA tests, the test indicated that there was a 1 in 7,600 chance that the DNA combination did not belong to Moore and Nevil.[1]

[9] On June 17, 2015, the State charged Nevil with murder and Level 2 felony arson resulting in serious bodily injury. On November 21, 2016, Moore filed a pre-trial motion to suppress his June 14, 2015 statement to the police. The trial court held hearings on the motion to suppress on April 19 and June 22, 2017. Following further briefing by the parties, the trial court denied the motion to suppress on July 12, 2017.

---

[1] Specifically, the forensic DNA report stated:

> Assuming two contributors, the probability of randomly selecting an unrelated individual who could be included as a contributor to the mixture obtained from Exhibit 28.Q1 [a swab of a light brown stain on the right side of Nevil's shirt] is listed below for the following populations:
> 1 in 7.6 thousand US Caucasians
> 1 in 62 thousand US African Americans
> 1 in 17 thousand US Southwest Hispanics

Ex. Vol., State's Ex. 90, p. 11. As Nevil is Caucasian, *see* Appellant's Confidential App. Vol. 4, p. 94, the chance of selecting a random contributor is 1 in 7,600.

A seven-day jury trial commenced on April 30, 2018. Nevil renewed his motion to suppress at the beginning of the trial and objected when his statements to the police were offered into evidence. At the conclusion of the State's case-in-chief, Nevil moved to strike his statement and for a directed verdict. The trial court denied both motions, and the trial continued. On May 10, 2018, the jury found Nevil guilty of murder but not guilty of arson causing serious bodily injury. At a sentencing hearing held on May 31, 2018, the court sentenced Nevil to sixty-five years of incarceration. Nevil now appeals.

### I. Motion to Suppress

Nevil's main argument[2] on appeal is that the trial court erred when it denied his motion to suppress his statement to the police. Because Nevil is appealing following his conviction and is not appealing the trial court's interlocutory order denying his motion to suppress, the question is properly framed as whether the trial court erred in admitting his statement into evidence. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. *Shelby v. State*, 986 N.E.2d 345, 359 (Ind. Ct. App. 2013), *trans. denied*. A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted

---

[2] As discussed *infra*, Nevil's argument regarding the sufficiency of the evidence is premised on his claim that his statement was improperly admitted.

the law. *Id*. But whether the challenge is made by a pre-trial motion to suppress or by trial objection, our standard of review of rulings on the admissibility of evidence is essentially the same. *Collins*, 822 N.E.2d at 218. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling, but we also consider the uncontested evidence favorable to the defendant. *Id*.

[12] Nevil contends that his statement to the police should have been suppressed because, he insists, Indiana police had no authority to arrest him on the Kentucky warrant for a probation violation. He therefore claims that his arrest based upon the Kentucky warrant violated his Fourth Amendment rights.[3] Since his arrest was allegedly invalid, Nevil claims that his confession to the police taken after his arrest should be suppressed.

[13] In support of his argument, Nevil claims that the United States Supreme Court "has determined that a detainer order for a probation violation is not recognized under the Interstate Agreement on Detainers ["IAD"] codified at [Indiana Code section] 35-33-10-4." Appellant's Br. at 14. In support of this, Nevil cites the Court's holding in *Carchman v. Nash*, 473 U.S. 716 (1985), which was in turn cited by the Indiana Supreme Court in *Crawford v. State*, 669 N.E.2d

---

[3] Although Nevil mentions both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, he develops no argument as to how application of Article 1, Section 11 would result in a different conclusion. Any separate claim under the Indiana Constitution is therefore waived. *See Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002) (concluding that state constitutional claim was waived where defendant presented no authority or independent analysis supporting separate standard under state constitution).

141 (Ind. 1996). In *Crawford*, our supreme court noted that the Court in *Carchman* "held that [IAD] Article III does not apply to detainers based on probation-violation charges." *Id*. at 149 n.6.

[14] The present case, however, does not implicate the IAD. The purpose of the IAD was explained by our supreme court in *Sweeney v. State*:

> The [IAD] was created to solve several problems which arose from the use of detainers. . . .[4] Before the [IAD] was enacted, there was no legal mechanism for prisoners to clear detainers filed against them by authorities outside the jurisdiction in which they were imprisoned. Consequently, detainers had the capability of restricting, circumscribing, or disrupting the activities, including rehabilitative activities, of prisoners within the sending state's prison. . . . As a result of the problems created by the use of detainers, the federal government and all the states that adopted the IAD determined that the primary purpose of the IAD would be to provide for expeditious disposition of all outstanding charges which may affect the conditions or duration of imprisonment and treatment, and also to prescribe procedures by which a state may obtain a prisoner incarcerated in another state. The IAD also provide[s] cooperate procedures among member states to facilitate such disposition.

704 N.E.2d 86, 95–96 (Ind. 1998) (citations and internal quotations omitted). In *Carchman*, the Court held that a prisoner in one state does not have the right to

---

[4] "Although the IAD does not define a detainer, the congressional record provides that '[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.'" *Sweeney v. State,* 704 N.E.2d 86, 95 (Ind. 1998) (quoting *United States v. Mauro*, 436 U.S. 340, 359 (1978)).

resolution of pending probation violations in another state under the IAD because the IAD applied only to pending criminal charges. 473 U.S. at 725.

[15] *Carchman* is inapplicable here because Nevil does not seek resolution of the pending probation violation in Kentucky under the IAD. He instead claims that his arrest on the Kentucky warrant was invalid. This does not implicate the IAD, and his references to cases involving the IAD are inapposite.

[16] Nevil also argues that the police could not properly arrest him based on the Kentucky warrant because such is not authorized by the Uniform Criminal Extradition Act ("UCEA"), codified at Indiana Code section 35-33-10-3. He refers specifically to subsection (15) of this statute, which provides:

> The arrest of a person may be lawfully made also by an officer or a private citizen **without a warrant** upon reasonable information that the accused stands charged in the courts of another state **with a crime punishable by death or imprisonment for a term exceeding one (1) year**; but when so arrested the accused must be taken before a judge with all practicable speed, and complaint must be made against him under oath setting forth the ground for the arrest as in the last preceding subsection; and thereafter his answer shall be heard as if he has been arrested on warrant.

I.C. § 35-33-10-3(15) (emphases added). Since he has not been charged in Kentucky with a crime punishable by death or imprisonment for a term exceeding one year, Nevil argues that the State could not justify his arrest based on the UCEA. But this subsection only applies to warrantless arrests. Here, Nevil was arrested based upon an active warrant found in the NCIC database.

[17]     We decline to hold that the arrest of an individual based upon a warrant in the NCIC database is "warrantless." To the contrary, an arrest based on a warrant found in the NCIC database is, by definition, **not** a warrantless arrest. This is true regardless of the reason for the warrant issued in the issuing state. Indeed, the following provision of the UCEA clearly allows for the extradition of detainees in Indiana based upon an accusation of a probation violation in a requesting state:

> A warrant of extradition shall not be issued unless the documents presented by the executive authority making the demand show that:
>
> > (a) except in cases arising under subsection 7 of this section, the accused was present in the demanding state at the time of the commission of the alleged crime, and thereafter fled from the state;
> >
> > (b) the accused is now in this state; and
> >
> > (c) he is lawfully charged by indictment found or by information filed by a prosecuting officer and supported by affidavit to the facts, or by affidavit made before a magistrate in that state, with having committed a crime under the laws of that state, **or that he has been convicted of a crime in that state and has escaped from confinement or has broken the terms of his bail, probation, or parole**, or that the sentence or some portion of it otherwise remains unexecuted and that the person claimed has not been discharged or otherwise released from the sentence.

I.C. § 35-33-10-3(5). This section clearly provides that a warrant for extradition may be issued for a person in Indiana if that person has been convicted of a crime in the demanding state and "has broken the terms of his . . . probation[.]"

*Id.* It would make little sense to hold that a person may be extradited to another state based on an alleged probation violation but that this person could not be arrested based on such a warrant. We therefore conclude that Nevil's arrest by Indiana police based on the Kentucky warrant was not a warrantless arrest.

[18] Nevil argues that there is no Indiana case regarding whether arresting a defendant on an outstanding warrant for a probation violation in another state is proper. He therefore cites cases from other jurisdictions. We agree with the State, however, that this issue was decided in *Shotts v. State*, 925 N.E.2d 719 (Ind. 2010).

[19] In *Shotts*, Indiana police officers received a call from a sheriff in Alabama informing them that there was a felony warrant for Shotts's arrest in Alabama. The local police confirmed the presence of the warrant in the NCIC database and eventually arrested Shotts. Before our supreme court, Shotts argued, as he had at trial, that the Indiana police had arrested him without legal authority and that the subsequent search of his person was improper. Specifically, he argued that the Alabama warrant was not supported by probable cause and that the Indiana police did not act in good faith because they did not obtain a paper copy of the warrant before arresting him. In addressing these arguments, our supreme court noted that, "in extradition proceedings the receiving state is not to review the probable cause determination of the demanding state." *Id.* at 724 (citing *Bailey v. Cox*, 260 Ind. 448, 452, 296 N.E.2d 422, 425 (1973) (holding that any challenge to an out-of-state arrest warrant under the UCEA must be resolved in the demanding state)). The court further concluded that the same

reasoning applies to the evaluation of an arrest in a receiving state based on a warrant issued by another state. *Id*. The court also held that the Indiana police, at the very least, acted in good faith in relying upon the Alabama warrant. *Id*. at 725–26.

[20]   We read *Shotts* to hold that Indiana police may reasonably rely on the validity of an out-of-state warrant contained in the NCIC database. Although the warrant in *Shotts* was for a felony, and the warrant here was for a probation violation, we think this is a distinction without a difference. As noted above, the UCEA clearly allows for the extradition of probationers accused of violating the terms of their probation from another state. We therefore conclude that the police in this case acted reasonably when they arrested Nevil based on the Kentucky warrant accusing Nevil of violating his Kentucky probation, and we discern no violation of Nevil's right to be free from unreasonable search and seizure.

[21]   We further conclude that the police reliance on the Kentucky warrant in the present case was, at the very least, in good faith. *See Shotts*, 925 N.E.2d at 725–26. The police did not arrest Nevil based on the unsworn word of an out-of-state police officer. They confirmed the presence of the warrant in the NCIC database. And, unlike in *Shotts*, here there has been no suggestion that the Kentucky warrant is invalid. But even if it was invalid, *Shotts* instructs us that the validity of the warrant is not to be challenged in the receiving state. *See* 925 N.E.2d at 724.

In short, Nevil's arrest in Indiana based on the Kentucky warrant alleging a probation violation was not invalid. Because his arrest was not invalid, Nevil's challenge to the admissibility of his confession to the police, which is based on his claim that his arrest was invalid, necessarily fails.

## II. Sufficiency of the Evidence

Nevil also claims that the State presented insufficient evidence to support his conviction for murder. When reviewing a claim that the evidence is insufficient to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses. *Harrison v. State*, 32 N.E.3d 240, 247 (Ind. Ct. App. 2015) (citing *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005)), *trans. denied*. Instead, we respect the exclusive province of the jury to weigh any conflicting evidence. *Id*. We consider only the probative evidence supporting the verdict and any reasonable inferences which may be drawn from this evidence. *Id*. We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id*.

As noted above, Nevil's argument regarding the sufficiency of the evidence supporting his conviction is premised on the presumption that his statement to the police was inadmissible. We have already determined otherwise. Thus, Nevil's argument is misdirected.

Viewing the evidence favorable to the jury's verdict, we can only conclude that Nevil's conviction was supported by sufficient evidence. He was at the scene of

the crime on the night of the fire; he located the victim's wallet; he gave inconsistent statements as to how he heard about the fire; he suggested to the police that two other individuals were robbing people in the area; he lied about his whereabouts on the night of the crime; the victim's blood was found on his shirt; and he confessed to killing Moore after getting into an argument. This is sufficient to support Nevil's conviction for murder.

## Conclusion

[26] The trial court did not abuse its discretion by admitting Nevil's confession to the police into evidence. Nevil's claim that his statement was inadmissible because his arrest was invalid is unavailing. The Indiana police could properly arrest Nevil based upon the Kentucky warrant for a probation violation that was found in the NCIC database. Because his arrest was proper, Nevil's argument fails. And because his statement was properly admitted, there was sufficient evidence to support his conviction for murder. We therefore affirm the judgment of the trial court.

[27] Affirmed.

May, J., and Brown, J., concur.